Argued and submitted November 1, 1988, the decision of the Court of Appeals
affirmed and the trial court decision reversed March 21, reconsideration denied
May 2, 1989

In the Matter of the Legality of
an Intergovernmental Agreement
between Lane County and the City of Eugene
Regarding Certain Improvements
to the Eugene Municipal Airport.

ROGERS,
*Respondent on Review,*

*v.*

LANE COUNTY et al,
*Petitioners on Review.*

(CC 16-87-00752; CA A44047;
SC S35387, S35492)

771 P2d 254

Timothy J. Sercombe, of Harrang, Long, Watkinson &
Arnold, P.C., Eugene, argued the cause for petitioner on

review City of Eugene. With him on the petition was Stanton F. Long, Eugene.

Teresa Wilson, Assistant County Counsel, Eugene, argued the cause for petitioner on review Lane County. William A. Van Vactor, County Counsel, Eugene, filed the petition for review.

Larry O. Gildea, Eugene, argued the cause for respondent on review.

Eric H. Carlson, Salem, filed an *amicus curiae* brief on behalf of the League of Oregon Cities.

Before Peterson, Chief Justice, and Linde, Campbell,** Carson, Jones and Gillette, Justices.

JONES, J.

---

** Campbell, J., retired December 31, 1988.

## JONES, J.

The issue in this case is whether Article IX, section 3a, of the Oregon Constitution[1] prohibits the use of highway funds for the construction of a parking lot and covered walkway at the Eugene municipal airport. Lane County (County) and the City of Eugene (City) entered into an agreement for the purpose of sharing certain highway funds. The County and the City brought a validation proceeding pursuant to ORS 33.710(2)(d) to obtain judicial approval of the agreement. William R. Rogers, Jr. (Rogers), appeared and objected to the validation. The trial court held that the construction of such improvements with highway funds is authorized by Article IX, section 3a, of the Oregon Constitution. The Court of Appeals reversed the decision of the trial court. *Rogers v. Lane County,* 91 Or App 579, 756 P2d 665 (1988). We affirm the decision of the Court of Appeals.

## I. FACTS

On January 23, 1987, the County and the City entered into an agreement entitled "Intergovernmental Agreement" (Agreement) in order to share certain funds authorized by ORS 294.950(2), which provides:

> "Subject to the limitation contained in subsection (3) of this section, a county may share the proceeds of any tax or excise described in section 3a, Article IX of the Oregon Constitution, with any city situated in whole or in part within the county for the purposes stated in that section."

Pursuant to the Agreement, the County granted $1,574,144 to the City to be used in connection with the expansion and improvement of Mahlon Sweet Field, an airport owned and operated by the City. These funds were highway fund monies distributed to the County by the State of Oregon. Because Article IX, section 3a, of the Oregon Constitution states that such funds "shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest

---

[1] Article IX, section 3a(1), provides in pertinent part:

"[R]evenue from [motor vehicle and gasoline taxes] shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state[.]"

areas," the Agreement limited the use of the granted funds to "expenditures allowable under Oregon Constitution, Art. IX, sec. 3a." More specifically, the Agreement provided that the funds were to be used for the following improvements: (1) entry and exit roads for travel to and from the airport, (2) a public parking lot adjacent to the entry and exit roads, and (3) a covered walkway from the parking lot to the airport terminal.

Under ORS 33.710(2)(d), certain public bodies may petition a circuit court "for the purpose of having judicial examination and judgment of the court as to the regularity and legality of * * * [t]he authorization of any contract." Under this statute, the County and the City filed a validation proceeding to test the legality of the Agreement, seeking a judgment that they had authority to enter into the Agreement under ORS 294.950 and that the expenditures described in the Agreement were lawful. ORS 33.720(3) allows "[a]ny person interested * * * [to] appear and contest the validity of such proceeding, or of the acts or things therein enumerated." Rogers contested the validation, arguing that the Agreement was illegal and invalid because the proposed expenditures violated Article IX, section 3a, of the Oregon Constitution.

The trial court found that the construction of the improvements provided for in the Agreement was a proper use of the road funds:

"* * * [I]t's my opinion that the agreement entered into now between the City and the County is legal. It does meet all the statutory and constitutional requirements that are necessary for it to enter into that agreement. The use and benefit theory is one that I think makes a great deal of sense, particularly in this sort of situation. The parking lot, the access roads, the walkway all seem to me to be directly related to and for the direct use and benefit of the motoring public to use the roads that go to the airport."

The trial court applied a so-called "use-benefit theory" which, as applied to Article IX, section 3a, originated from opinions of the Oregon Attorney General. The use-benefit theory requires that taxes derived from the use of the highways be applied for the benefit of those who pay the taxes:

"Does the program benefit those who pay the taxes which

would support it? Specifically, does it render use of the highways more convenient or more pleasurable?" 35 Op Att'y Gen 70, 75 (Or 1970).

The Court of Appeals reversed the trial court's decision with respect to the parking lot and covered walkway. The Court of Appeals, in effect, held that the trial court erred in relying solely on the use-benefit test, quoting the following excerpt from 41 Op Att'y Gen 545, 547 (Or 1981):

> " '[B]enefit alone is not sufficient. Art IX, Sec 3a does not authorize expenditures for anything as broad as benefits to highway users, but limits them "exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas * * *.
>
> " 'In short, expenditures must be for the highway *itself.* In 35 Op Atty Gen 198 (1970), it was concluded that indirect benefits to highway users, such as mass transit facilities which reduce highway congestion, were not included.' (Emphasis in original.)" *Rogers,* 91 Or App at 582.

The Court of Appeals noted that "[a]lthough Attorney General opinions are not precedential, [*Alexander v. Gladden,* 205 Or 375, 383, 288 P2d 219 (1955),] the [above] excerpt is consistent with the legislative intent expressed in the Voters' Pamphlet concerning the ballot measure by which the people adopted Article IX, Section 3a." 91 Or App at 582. The Court of Appeals held:

> "Given the specific language in Article IX, section 3a, and the legislative intent expressed in the Voters' Pamphlet, we conclude that the proposed expenditures for a parking lot facility and covered walkways are not authorized by the constitution. They are, at best, highway-related projects." 91 Or App at 583.

The County and the City now seek review and reversal of the Court of Appeals opinion.

## II.  BACKGROUND

A Transportation Research Board report provides an historical foundation for our discussion:

> "Prior to the decade of the 1930's, highways that connected major cities on an interstate basis were either nonexistent or a connection of county roads, mostly unpaved, poorly graded, and ill-equipped for motor vehicle travel.

"To remedy this situation, the several States enacted legislation imposing a tax on gasoline or other liquid motor fuel and a further tax on any license, registration fee, or other charge with respect to the operation of motor vehicles on the public highways. The revenues raised by the imposition of such taxes was then set aside for highway construction and maintenance. To insure that this revenue was not diverted to other uses, legislation was enacted, and frequently constitutional amendments adopted that earmarked such funds for the sole or exclusive purpose of construction, maintenance, and supervision of the public highways of the State. The language employed in these so-called 'antidiversion' constitutional amendments differs somewhat from State to State, but their purpose is uniform—to preserve and limit expenditure of the funds for a 'highway purpose.'" Research Results Digest 68, March 1975, pp 1-2.

Oregon was no exception to this historical development.

Prior to 1942, Oregon's use of monies derived from gasoline taxes and other vehicle fees was governed by statute. *See* Title 100 of OCLA (1940). At the November 1942 election, however, the people adopted an amendment to Article IX, section 3, of the Oregon Constitution which provided in relevant part:

"* * * The proceeds from any tax levied on, with respect to, or measured by the storage, withdrawal, use sale, distribution, importation or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles, and the proceeds from any tax or excise levied on the ownership, operation or use of motor vehicles shall * * * be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation, use and policing of public highways, roads and streets within the state of Oregon, including the retirement of bonds for the payment of which such revenues have been pledged, and also may be used for the acquisition, development, maintenance, care and use of parks, recreational, scenic or other historic places and for the publicizing of any of the foregoing uses and things."

A joint legislative subcommittee submitted an argument for the Voters' Pamphlet in favor of the amendment in which it stated that the amendment

"provide[d] that the state keep faith with the users of its highways who gladly pay and have paid these taxes because of

their unquestioning reliance and full expectation that the proceeds would be applied to the highway purposes to which they now are dedicated. [The amendment] make[s] certain that the present policy of this state to use highway user funds for highway purposes will be continued."

In *State ex rel Sprague v. Straub,* 240 Or 272, 279, 400 P2d 229, 401 P2d 29 (1965), this court commented on the intent of the voters with respect to the enactment of this constitutional amendment:

"Article IX, Section 3 of the constitution * * * restricted the use of this form of revenue to highway purposes. It is apparent that the intent of the people when they adopted the amendment was to guarantee that none of the 'proceeds' of the taxes and fees listed in the amendment would be diverted to any other purpose."

In short, this constitutional amendment made it clear and unambiguous that the people of Oregon wanted monies derived from taxes and fees on motor vehicles and motor vehicle fuels to be used only for highway purposes.

In the 1970s, a number of people were not happy with the use of their motor vehicle and gasoline taxes.[2] The condition of Oregon's state highway system had seriously declined during the latter half of the decade.[3] Despite this state of affairs, Oregon voters rejected a one cent increase in gasoline taxes in 1976 (Ballot Measure No. 8 of the 1976 general election) and a two cent increase in gasoline taxes in 1978 (Ballot Measure No. 5 of the 1978 primary election). A 1979 poll indicated, however, that the majority of the people of Oregon were willing to support a gas tax increase if the monies derived therefrom were used only for highway maintenance and construction.[4] The legislature was aware of this poll[5] and responded by passing Senate Joint Resolution 7 (SJR 7), which proposed the repeal of Article IX, section 3, and the enactment of a new section in its place. The legislature

---

[2] *See* Minutes, House Committee on Transportation, May 24, 1979; Minutes, Senate Committee on Transportation, February 7, 1979; Minutes, Joint Ways and Means Committee, April 24, 1979.

[3] Oregon Department of Transportation, State Highway System Preservation Study 1-2 (Feb. 1979).

[4] Minutes, House Committee on Transportation, May 24, 1979, p 2.

[5] *See id.*

referred this measure to the Oregon voters, who approved it at the May 20, 1980, primary election.

In relevant part, the new section 3a, which is in effect today, eliminated the use of motor vehicle and gasoline taxes for the funding of police, parks, scenic and historic places, permitting the use of such funds only for highways, roads, streets, and roadside rest areas:

"(1)   * * * [R]evenue from the following shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state:

"(a)   Any tax levied on, with respect to, or measured by the storage, withdrawal, use, sale, distribution, importation or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles; and

"(b)   Any tax or excise levied on the ownership, operation or use of motor vehicles."

The Voters' Pamphlet contained a Joint Legislative Committee argument[6] in favor of the ballot measure, which stated in part:

"It's time to save our multi-billion dollar investment in our highway system. *It's time to stop the raid on the Highway Fund.* It's time to reduce gasoline consumption, reduce auto repairs, and make our highways safer.

"* * * *Measure No. 1* will protect the Highway Fund; it *will constitutionally dedicate the Highway Fund to streets, roads, and highways only.*

"Under present law the Highway Fund can be used to pay for state police, parks, and other 'highway-related programs.' This has been done and the result has been to rob our highways of needed maintenance.

"These so-called 'highway-related programs' will still be funded but will be financed from the State General Fund—not from gasoline taxes, weight-mile taxes, *and vehicle registration fees.*

"* * * * *

"A POORLY MAINTAINED HIGHWAY SYSTEM is costing all of us a lot of money. Over 58% of our highways have been designated moderately or extremely deteriorated by the

---

[6] Pursuant to ORS 251.245 the Joint Committee was appointed for the purpose of providing the legislative argument in support of SJR 7.

Highway Preservation Study. This percentage will grow every year under our present funding system.

"Our rough and crumbling road system is not just uncomfortable and inconvenient. It can lead to economic decline in our state. It will mean more costly rebuilding of our highways if timely repairs are not made. Rough roads bring greatly reduced fuel efficiency. Bad roads increase the number of costly automobile repairs. Highway deterioration also contributes to automobile accidents and higher auto insurance costs.

"Ballot Measure No. 1 says that the Highway Fund 'shall be used exclusively for the construction, reconstruction, improvement, repair, and maintenance, operation and use of public highways, roads, streets, and roadside rest areas in this state.' IT'S ABOUT TIME." (Emphasis added; capitalization in original.)

The Joint Legislative Committee focused on highway maintenance and made statements such as: "It's time to stop the *raid* on the Highway Fund"; "[This measure] will constitutionally dedicate the Highway Fund *to streets, roads, and highways only*"; "Under present law the Highway Fund can be used to pay for state police, parks, and *other 'highway-related programs'*[;] * * * [this has] rob[bed] our highways of needed maintenance"; and "[Under this measure] [t]hese so-called *'highway-related programs' will* * * * *not* [be financed] from gasoline taxes * * * and vehicle registration fees." (Emphasis added.)[7]

---

[7] It should be noted that the Joint Legislative Committee argument in favor of the ballot measure also stated: "Passage of Measure No. 1 will not eliminate our BICYCLE TRAILS program as some contend. It would continue to allow funding bicycle trails inside of highway rights-of-way." Whether highway funds would be able to be used to pay for bicycle paths if SJR 7 passed was a significant political issue. *See* Minutes, House Committee on Transportation, May 24, 1979; Minutes, Senate Committee on Transportation, Feb. 7, 1979. This is demonstrated by the fact that some bicycle enthusiasts participated in the hearing process. *See* Minutes, Senate committee on Transportation, Feb. 7, 1979. The political importance of the bicycle path issue explains its specific mention in the argument in favor.

It is also worth noting that the Attorney General's response dated January 31, 1979, to Opinion Request OP-4574 was called to the legislators' attention. *See* Minutes, House Committee on Transportation, May 24, 1979; Minutes, Senate Committee on Transportation, Feb. 7, 1979. In fact during the hearing process, one senator mentioned the Attorney General's position to several groups concerned about the funding of bicycle paths, stating that bicycle paths within highway rights-of-way could be paid for with highway funds. *See* Minutes, Senate committee on Transportation, Feb. 7, 1979. This Opinion Request asked whether the conclusions stated in 38 Op Att'y Gen 800 (Or 1977) relating to the effects of SJR 30 (1977 session) (a proposal

## III. WHETHER ARTICLE IX, SECTION 3a AUTHORIZES THE SPENDING OF HIGHWAY FUNDS ON AIRPORT PARKING LOTS AND COVERED WALKWAYS

We begin by examining the language of Article IX, section 3a, of the Oregon Constitution. Article IX, section 3a, provides in relevant part that motor vehicle and fuel taxes "shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas." The objects on which these highway funds may be used include only "public highways, roads, streets and roadside rest areas." Airport parking lots and covered walkways from an airport parking lot to an airport terminal are not included in this series. Nonetheless, petitioners argue that the authorization for spending these highway funds on such projects is derived from the terms "improvement, * * * operation and use." We now address that contention.

As discussed above, Article IX, section 3a, originated from SJR 7. SJR 7 and the Joint Legislative Committee argument in favor of the measure appeared in the official Voters'

---

similar to SJR 7) would also apply to SJR 7. In relevant part, the Attorney General responded that under SJR 7 highway funds could not be used to pay for bicycle trails outside of highway rights-of-way, but could be used to fund bicycle trails inside highway rights-of-way. In so stating, the Attorney General found that the following language from its answer in 38 Op Att'y Gen 800 concerning bicycle trails within highway rights-of-way was applicable to SJR 7:

"[A] *separate bicycle lane within the right-of-way would be part of the highway itself.* Its availability would increase convenience of use of the highway for other users. We note that * * * [cyclists] have always been highway users, and were highway users at the time Article IX, Section 3 was amended to constitutionally dedicate the highway fund. * * * We accordingly conclude that spending highway funds to accommodate this traditional use, and at the same time to make highway use more convenient for motor vehicles, was within the contemplation of the drafters of present Article IX, Section 3 and would be a permissible use even without the provision allowing park and recreational use. The proposed amendment would not change this result. * * *

"It is possible, however, the court will hold that *only very limited use of highway funds for bicycle trails within highway rights-of-way will be permissible. Strict* application of the use-benefit doctrine could result in a holding that an expenditure of highway funds is permissible * * * only if its primary purpose is to benefit motor vehicle traffic, with no more than incidental benefit to cyclists. Such a philosophy would limit permissible expenditures to striping, signs, and an occasional separate lane, designed to get bicycle traffic out of motor vehicle traffic lanes and not to make bicycle traffic more convenient or pleasant." 38 Op Att'y Gen at 808-09. (Emphasis added; emphasis in original deleted.)

Pamphlet for the 1980 primary election. *State ex rel Chapman v. Appling,* 220 Or 41, 68-69, 348 P2d 759 (1960), stated:

"This court has recognized in a number of cases that arguments in the official Voters' Pamphlet relative to measures submitted to the people may be resorted to as an aid to construction. Discriminating and cautious use must be made of such material because of its partisan character. We think, however, that in the present instance it is proper to refer to the argument in favor of this [constitutional amendment]. * * *"

As in *Appling,* the Voters' Pamphlet argument in this case helps us in resolving this dispute. The language of this argument in favor demonstrates that the Joint Legislative Committee clearly intended a narrow application of this new constitutional provision to the specific purposes stated. Accordingly, we narrowly construe Article IX, section 3a.

Because the language of Article IX, section 3a, must be narrowly construed, expenditures of motor vehicle and fuel taxes within the meaning of "improvement, * * * operation and use" must be limited exclusively to expenditures on highways, roads, streets and roadside rest areas themselves and for other projects or purposes within or adjacent to a highway, road, street or roadside rest area right-of-way that primarily and directly facilitate motorized vehicle travel. In the instant case, the proposed expenditure of highway funds for the construction of an airport parking lot and a covered walkway from the parking lot to the airport terminal is simply a convenient "raid" on highway funds. The expenditure does not fall within these definitions, because the proposed expenditure is an expenditure for the construction of an airport parking lot and covered walkway, rather than an expenditure for a highway, road, street or roadside rest area itself. Further, it is an expenditure primarily for the operational convenience of an airport, rather than for a project or purpose within or adjacent to a highway, road, street or roadside rest area right-of-way that primarily and directly facilitates motorized vehicle travel.

## IV.   CONCLUSION

We agree with the Court of Appeals that these proposed expenditures "are, at best, highway-related projects." 91 Or App at 583. Accordingly, we hold that the proposed expenditure of funds for the construction of an airport parking lot

and covered walkway from the parking lot to the airport terminal is not authorized by Article IX, section 3a, of the Oregon Constitution.

The decision of the Court of Appeals is affirmed, and the decision of the trial court is reversed.

**GILLETTE, J.,** concurring in part and dissenting in part.

The majority opinion thoughtfully addresses the question presented by this case, but reaches a conclusion at odds with what I believe to be the correct answer. Obviously, reasonable minds may differ. My own conclusion (also reasonable, I hope) would sustain use of the funds for the parking lot but not the walkway. I therefore am required to dissent in part.

If the majority opinion has a significant analytical flaw, it is that the majority has not articulated any standards to flesh out the constitutional limitation that highway user taxes "be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas." This criticism may be justified only to a small degree, however; the majority does not have a lot of elbow room. Such concepts as "construction, reconstruction, improvement" and the like are pretty much self defining. What concepts in Article IX, section 3a, leave some room for judicial interpretation?

Not many. At bottom, we only are asked to define more specifically the concepts inhering in the word "use" and in the phrase "public highways, roads, streets and roadside rest areas." That is to say, we are asked whether one is using a highway when one parks on, beside or adjacent to a highway and whether a parking lot on, beside or adjacent to a highway is nonetheless a highway.[1]

It is not unusual to see informed experience recast old legislative language in a new form in order to remedy defects in the older version or to refocus the priorities the language is supposed to serve. That is precisely what happened here. The 1942 constitutional provision was seen as too permissive; it

---

[1] I ignore for the purposes of this part of the analysis the question of the covered walkway. The answer to that part of the question is easier than the rest of the question.

needed curtailing. To do that, a substitute constitutional provision was offered to the public. Much of the language was the same, but the public was told specific things about the future scope to be given to that language. This information, on which I agree with the majority that we should treat the public as having acted, *see State ex rel Chapman v. Appling,* 220 Or 41, 68-69, 348 P2d 759 (1960), assured the public that the constitutional provision would in the future be given a relatively narrow construction in order to assure that road taxes would be applied primarily to roads. Whenever constitutional language is reenacted with an explanation as to its scope that purports to define what the language will mean in the future, I would treat the explanation as the principal source of information as to the meaning of any indefinite or ambiguous portion of that language.[2]

Operating on the foregoing principle, I conclude that the majority correctly explains what it was that the 1980 constitutional amendment was intended to accomplish. The remaining question is whether the majority has correctly applied its understanding of the meaning of the 1980 amendment.

As to the covered walkway, the answer is yes. Of course, the point is not that this expenditure was for a walkway, or that the walkway was covered. The point is that the walkway was not a highway, road, street or roadside rest area. Had it been placed immediately beside a road for the purpose of keeping pedestrian traffic off the road surface, thereby facilitating vehicular traffic, it might have qualified under the constitutional language even if it were covered. But that is not where it was located, as I understand the record. Instead, it took foot traffic back and forth between the parking lot and the terminal. Even if the parking lot were qualified, the walkway would not be.

The parking lot is a tougher question. Clearly, even the majority believes that the constitutional language will permit funds to be used for parking spaces at the side of a highway, street or road. That is, the majority believes that

---

[2] If the explanation instead purported to explain what the language had meant *in the past,* I should give it less credence, at least in those cases in which the explanation was wrong as to its history. But that is not the case before us today.

"use" in the constitutional language has its common meaning, *viz.,* "to put into action or service: have recourse to or enjoyment of: employ," Webster's Third New International Dictionary (1971), and therefore includes space used for parking under some circumstances.

I assume this would be true even if the parking area could only be accommodated by widening the road. I am also satisfied that a much wider parking area at certain scenic points (such as those found along our coast) or at the terminus of a road would qualify. In each of these cases, the "parking area" is in fact simply a device adjacent to and connected to the road that is of great (I do not insist that it be "primary") value to the motoring public in that it permits those who wish to stop (briefly, or for a week) to separate themselves safely from those who wish to turn around or go on. Nothing in the majority opinion really is contrary to my assumption. "Use" of what otherwise qualifies as a highway, road or street includes employing portions of that highway, road or street as a parking area.

This brings us to the parking area in this case. This parking area does all that I suggest the other examples do: it permits people arriving at a destination to which we all agree a road may be built with road tax funds to stop for a short time, for a long time, or to pass through. Therefore, if this parking lot does not qualify, it fails because it is not a "highway, street or road." But, if it is not one of these three, the majority does not explain why it is not where (as already demonstrated) the use to which it is to be put qualifies under the constitutional language.

Even narrowly construing the authorizing language of Article IX, section 3a, I cannot see a principled justification or explanation for distinguishing between use of road tax funds for this purpose and their use for establishing other parking areas. Accordingly, and unlike the majority, I would hold that the expenditure of funds for the parking lot at Mahlon Sweet Field was permissible under Article IX, section 3a, of the Oregon Constitution. I respectfully dissent from

that portion of the majority opinion that holds to the contrary.[3]

**LINDE, J.,** dissenting.

In order to deny motor vehicle and fuel taxes for funding the facilities here in dispute, though they are designed to be used by motor vehicles and for pedestrian access to motor vehicles, the majority constructs a faulty and obscure constitutional formula and needlessly complicates traffic management by state and local agencies.

Lane County and the City of Eugene agreed to use some of the county's share of state funds from motor vehicle and fuel taxes for "expenditures allowable under Oregon Constitution, Art. IX, sec. 3a," in order to construct entry and exit roads, a parking area, and a covered walkway from the parking area to the airport terminal. Article IX, section 3a, allows the use of such funds for "the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state." The majority holds that these terms do not allow funding the parking area or the walkway. I believe that this holding misapplies the constitutional text.

Public officials and others who apply the laws governing permissible and impermissible uses of highway funds will not find clear guidance in the opinion. The majority's formula for using motor vehicle and fuel tax funds for "improvement, * * * operation and use of public highways, roads, streets and roadside rest areas" has two parts: (1) that the projects or purposes "primarily and directly facilitate motorized vehicle travel," and (2) that these "projects or purposes" be "within or adjacent to a highway, road, street or roadside rest area right-of-way." The majority then characterizes the expenditures in this case as being "primarily for the operational convenience of an airport, rather than for a project or purpose within or adjacent to a highway, road, street

---

[3] No party has addressed — and the majority does not address — the difficult question of the appropriate scope of review in cases such as this one. However, in treating the matter as one calling for *de novo* review of the trial court's decision, the majority may be using a standard inappropriate to the public law context in which issues arise under this constitutional provision.

or roadside rest area right-of-way that primarily and directly facilitates motorized vehicle travel."

The formula is inadequate for several reasons. Whenever a court falls back on elastic qualifiers like "primarily" and "directly," it in effect declines to lay down firm criteria and reserves future factual variations to case-by-case decisions. Under the formula, today's holding decides no more than this case. To make funding decisions so doubtful and prone to litigation is not in the interest of efficient planning and public administration.

Second, the reference to location "within or adjacent to" a right-of-way is arbitrary and unexplained. If a "project" or a "purpose" otherwise is eligible as "primarily and directly" (to use the majority's words) serving or improving the operation and use of a highway, road, street, or roadside rest area, why does it matter whether it is within or adjacent to the right-of-way? The constitutional text does not refer to any "right-of-way." Making this a part of the test may simply push agencies into acquiring otherwise unneeded rights-of-way to accommodate the location of such facilities. Besides, the formula invites future disputes about what it means for a "purpose" to be within or adjacent to a right-of-way, and how close is "adjacent."

The majority's formula, however flawed and inadequate it is for situations not now in the court's contemplation, is designed to exclude funding in this particular case. The narrow holding is that *this* parking lot is an "airport parking lot," which the court finds to be "primarily" for the airport, not "primarily and directly" for facilitating "motorized vehicle travel," and *this* "covered walkway" leads to an airport terminal and therefore does not primarily aid motorized travel. The majority does not explain why public facilities for parking vehicles driven on public roads to a public airport differ from facilities for parking vehicles on or near a street or road at any other location. There is no apparent reason to distinguish parking, for instance, at mass transit stations, or wherever needed to allow vehicles to move on crowded city streets. People ordinarily drive a vehicle in order to get to a destination where they intend to park and leave the vehicle. Does the majority believe that the drafters of Article IX, section 3a, meant to provide motor vehicles with support under

their wheels only as long as they remained in motion, doomed like the Flying Dutchman never to settle into any port? Anyone who has been trapped in a car for lack of a parking space may doubt that this was the drafters' intent.

Yet the majority unaccountably singles out the present project as an *airport* parking lot. Is this because parking at an airport, as distinct from other locations, relates to another mode of transportation? The majority says that the disputed parking area is designed "primarily" to serve the airport rather than motor vehicle traffic. But the parking area is not for airplanes. It is not a terminal building for passengers. The parking area is for motor vehicles. If people cannot efficiently reach or use a location—an airport, a convention center, a coastal park, a ski resort, or any other—by motor vehicle because they cannot park and get out of their vehicles, then construction of an improved vehicle parking facility "directly" and "primarily" (in the majority's words) serves and improves the "operation and use" of the streets and roads by motor vehicles to, from, and at that location. If people cannot park and leave their vehicles, they have little reason to drive them on the streets and roads, the "operation and use" that is the object of Article IX, section 3a. The majority's use of its adverbs to announce the opposing holding only demonstrates the vagueness of its formula.

The same applies to the "covered walkway." That a walkway is "covered," of course, is no more relevant than that a road, a tunnel, or a bridge is covered, and I do not understand the majority opinion to exclude sidewalks and other pedestrian walkways as long as they can be described as part of the street or road. Of course, if a walkway (for instance, a new pedestrian bridge) is built some distance from the existing vehicular bridge in order to separate and improve vehicle traffic, it may run afoul of the majority's "right-of-way" or "adjacent" criterion, unless the state or local agency can find space for the pedestrian span within an existing right-of-way or if it is foresighted enough to anticipate such improvement when acquiring new rights-of-way.

I would like to think that the formula does not exclude a pedestrian overpass or underpass across rather than alongside a street or road, which clearly serves its use by motor vehicles, regardless whether the crossing can be described as

"part of" the street or road. But why not a walkway at an airport? Suppose that an airport is served by a rail transit system easily accessible from inside the terminal, as some metropolitan airports are, but that motor vehicles can be reached only by crossing surface streets, often in dark, cold, or stormy conditions. Again, a covered walkway "directly" serves travel by automobile, not "primarily" air travel, just as an overpass or underpass across a busy highway or city street serves vehicle traffic.

In sum, the disqualification of the intended projects is not explained by the fact that they provide parking, or walkways, or a cover over a walkway, or that they are located at an airport or are not within a road or street right-of-way. This lack of a premise that can consistently apply in other situations indicates that the decision is wrong.

The complications which the majority regrettably creates for state and local planners are quite unnecessary. The words of Article IX, section 3a, here at issue in fact were unchanged from the previous section 3, adopted in 1942, except that "roadside rest areas" were added and "policing" was deleted. Assuming, as the court does, that the scope of section 3a is elucidated by the explanations accompanying its amendment in 1980, I see nothing in the materials quoted in the majority opinion that excludes funding for structures designed to facilitate the operation and use of streets and roads by motor vehicles. There is no dispute that this was the object of the 1980 measure. The dissatisfaction that led to the measure, as the majority states, was with the use of motor vehicle and fuel taxes for funding police, parks, and scenic and historic places. Funds for policing, while certainly important to motor vehicle traffic, were diversions from structures to salaries and other costs of police services. Motor vehicle and fuel taxes used for Oregon's state parks and, in smaller amounts, for historic and scenic places, largely went into physical properties, but properties not designed to serve transportation by motor vehicles. These diversions—to nonstructural police services and to property expenditures that did not make motor vehicle travel safer, easier, more efficient or convenient—were the issue in the debates leading to the 1980 amendment. The use of motor vehicle and fuel tax funds for *structures* designed to improve the *operation and use* of streets and roads by motor vehicles was not a debated issue, and the

amendment did not change the permissible scope of those uses.

The test whether a structure improves the operation and use of a highway, road, street, or roadside rest area is far more accurate and workable than the majority's elastic adverbs "directly" and "primarily." The test allows funding facilities for use by motor vehicles while stationary as well as while they are in motion. It does not, like the majority opinion, invite meaningless dispute whether a public parking area or similar facility is built "primarily" to serve the destination of people traveling in motor vehicles or "primarily" to serve these people in driving the motor vehicles to that destination. The purpose of allocating tax funds to one rather than another project is, after all, for government policymakers to say; if the legislature, a state agency, or a local government, to satisfy the majority, recites that construction of a project is needed "primarily and directly" to facilitate the use of a street or road by motor vehicles, I suppose its view will deserve the degree of deference ordinarily given governmental decisions of that kind. The best thing to be said for today's decision by a 3-2 majority is that it only holds that the Eugene airport project fails the majority's formula, leaving future cases indeterminate. This leaves room for future reconsideration of the formula, though at needless cost to the present project and to the state and local agencies charged with planning and managing traffic in this state.

Because I disagree both with the formula and with its application in this case, I dissent.