"(13) The department shall disclose personal information [in driver records] to a person who is in the business of disseminating such information under the following conditions:
"(a) In addition to any other requirements under the contract executed pursuant to paragraph (b) of this subsection, the person requesting the information must file a performance bond with the department in the amount of $25,000. The bond must be executed in favor of the State of Oregon and its form is subject to approval by the Attorney General.
"(b) The disseminator shall enter into a contract with the department. A contract under this paragraph shall contain at least the following provisions:
"(A) That the disseminator will not reproduce or distribute the personal information [in driver records] in bulk but only in response to an individual record inquiry.
"(B) That the disseminator will provide the personal information [in driver records] only to a person or government agency authorized to receive the information under this section and only if the person or government agency has been authorized by the department to receive the information.
"(C) That the disseminator will have a method of ensuring that the disseminator can delay for a period of up to two days the giving of personal information [in driver records] to a requester who is not a subscriber."
**220 Plaintiffs acknowledge that that statute does not explicitly state that ODOT must provide driver records electronically. However, plaintiffs assert, that requirement is implicit in the mandate that ODOT provide disseminators access to driver records. Plaintiffs argue that access to driver records is valuable to disseminators only if the access is provided in electronic form. Physically waiting in line at the DMV, plaintiffs contend, simply does not work for a disseminator, and the legislature knew that when it directed ODOT to disclose records to them under ORS 802.179(13). Plaintiffs argue that that position is supported by the prohibition on disseminators reproducing driver records in "bulk" and the reference to disseminators' arrangements with a "subscriber." ORS 802.179(13)(b)(A), (C). In plaintiffs' view, those clues suggest that the legislature envisioned disseminators receiving records in bulk and providing them to subscribers electronically. Plaintiffs contend that those references indicate that the legislature intended to require ODOT to provide disseminators with electronic access to driver records.
We are not convinced. A statute's text is the best indicator of legislative intent, see State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (stating method for statutory interpretation), and, as plaintiffs seem to acknowledge, there is no textual support for *1087 their argument. "Electronic access"-or any derivation thereof-does not appear anywhere in the statute, and context-including those clues cited by plaintiffs-does not suggest that we should insert those words. That disseminators are prohibited from reproducing records in bulk does not mean, as plaintiffs suggest, that disseminators must receive those records in bulk. And, even if it does, that fact says nothing about the means by which ODOT must provide bulk records to disseminators. A bulk transfer can be accomplished by methods other than electronic access, including by portable electronic storage media (e.g. , hardcopy or a so-called "flash drive").[11] Similarly unavailing is plaintiffs' reliance on the statute's reference to **221 a "subscriber." Even if plaintiffs are correct that the legislature contemplated instantaneous conveyance of electronic driver records between disseminators and subscribers, that does not mean that the legislature intended to require that ODOT provide that access. The legislature's use of the words "bulk" and "subscriber" does not persuade us that it did.
The legislative history of ORS 802.179(13) also does not provide plaintiffs with significant assistance. House Bill (HB) 2096 (1997)-the bill that became ORS 802.179 -was introduced in response to a data breach in which hundreds of driver records, including those of victims of domestic violence, were wrongly published on the internet.[12] Exhibit A, Senate Committee on Transportation, HB 2096, May 19, 1997 (written testimony from Rep Barbara Ross); see also Exhibit A, House Committee on Transportation, HB 2096 Feb. 19, 1997 (letter from Sen. Shirley Stull explaining that people were "outraged by the DMV computer fiasco" and letter from DMV Manager Jan Curry to individual affected by breach). Representative Barbara Ross explained that HB 2096 was needed to address the "potential for predators, abusers[,] and criminals to misuse" personal information contained in driver records. Exhibit A, Senate Committee on Transportation, HB 2096, May 19, 1997. Ross acknowledged that the bill should "allow people access for legitimate needs" and only for specific purposes. Id. A representative from DMV echoed that sentiment, stating that the bill would require a "culture change at DMV" by instilling "the idea that DMV's records are now 'closed,' with certain exceptions, rather than 'open' with certain exceptions." Exhibit S, Senate Committee on Transportation, HB 2096, May 21, 1997 (written testimony from Bill Seely); see also ORS 802.177 (personal information in driver records cannot be disclosed except to those persons or entities listed in **222 ORS 802.179 ). That history indicates that ORS 802.179 was not intended to mandate that driver records be obtainable in electronic form; rather, it was intended to restrict access to such records, permitting only a limited group of people and entities to obtain them.[13] The legislature might have been aware of disseminators' and subscribers' interests in conducting business electronically. However, we cannot discern, from the statute's text, context, or legislative history, a legislative command that ODOT serve those interests. *1088 We therefore reject plaintiffs' contention that ORS 802.179(13) requires ODOT to provide disseminators with electronic access to driver records, and we turn to the alternative basis for their argument that ODOT did not have the authority to enter into the license agreement with DAS. In particular, plaintiffs argue that, as a matter of law, the inability to profit from the ownership of property cannot be a basis for a determination that property is no longer "useful" for department purposes.[14] ORS 366.395(1). Plaintiffs contend that ODOT, like other agencies, uses assets to provide a service to the public, not to make money, and that the usefulness of its assets is determined by the extent to which they enable ODOT to carry out its mission of service. Applying that proposition here, plaintiffs argue that, even if ODOT could not profit from its ability to provide electronic access to driver records, that ability was useful to enable ODOT to serve disseminators.
Defendants' rejoinder is that inability to profit is a valid measure of whether a trust asset is no longer "useful" for department purposes under ORS 366.395(1). That provision, defendants argue, focuses on the "opinion" that ODOT forms and is highly deferential to ODOT's judgment. Defendants add that the terms "needed, required or useful" are not defined and that ODOT's conclusion in this instance **223 was consistent with the common understanding of those terms.
Plaintiffs do not identify a textual basis for their argument that an inability to profit from the ownership of a particular asset cannot be a measure of its usefulness. Nor do they offer any definition for the word "useful." Rather, they juxtapose the text of ORS 366.395(1) with two other statutes to contend that the legislature's reference to "equal or superior" value in those statutes as a prerequisite for a transfer of property provides helpful context.
The first statute that plaintiffs cite gives ODOT the authority to convey six parcels of real property along the Columbia River if the exchange, in the judgment of the department, is "of equal or superior useful value for public use." ORS 366.337 (emphasis added); see also Or. Laws 1953, ch. 21, § 1 (describing the six parcels). The second statute permits the state to exchange property that is "held as an asset of any special trust fund securing the payment of bonds *** for other property of equal or superior value ." ORS 273.416 (emphasis added). The presence of "equal or superior" value in those provisions and its absence in ORS 366.395(1), plaintiffs suggest, means that the legislature did not intend that inability to profit be a metric under the latter.
We disagree. The fact that, in the cited statutes, the legislature specifically permitted the sale of specified properties to obtain equal or superior value does not mean that the legislature intended to preclude the sale of unnecessary assets for a profit. ORS 366.395(1) grants ODOT broad authority to dispose of property that, in its opinion, is no longer needed, required, or useful for department purposes. ODOT undoubtedly acquires and divests itself of vehicles, equipment, supplies, and other assets every year. The legislature understandably gave ODOT substantial flexibility in engaging in such transactions. If ODOT forms an opinion that its property is no longer needed, required, or useful for department purposes, ORS 366.395 does not preclude ODOT from obtaining equal or superior value in exchange for such property. Plaintiffs are correct that, when ODOT provides driver records to disseminators under **224 ORS 802.183,[15] it must do so at cost. But ODOT can and does carry out its mission of service-providing driver records to disseminators at cost-without the ability to provide electronic access to those records. In making that determination, it is important to recognize that ODOT's mission of service is broader than providing disseminators with *1089 electronic access to driver records. See ORS 184.615 (establishing ODOT and listing its duties). ODOT is charged with providing a safe, efficient, and up-to-date transportation system, and it thus must serve the interests of the public at large. See ORS 184.615(2)(a) (requiring ODOT to carry out policies of the Oregon Transportation Commission); ORS 184.617 (1)(c) (giving the Oregon Transportation Commission duties, among which is to develop and maintain plan for "safe, multimodal transportation system for the state which encompasses economic efficiency, orderly economic development and environmental quality"). Although providing electronic access to driver records may well be useful to disseminators , it may not be useful to ODOT in fulfilling its overall mission. We conclude that ODOT acted within its statutory authority when it considered its inability to profit in forming an opinion that the license it sold to DAS was not useful for department purposes. For that reason and those discussed above, we reject plaintiffs' arguments that the license granted to DAS was property that could be not be transferred under ORS 366.395(1).[16] **225 B. Whether the License was Disposed of in the Manner Contemplated by ORS 366.395(2)
As explained, ORS 366.395(2) prescribes the manner in which ODOT may transfer disposable property: in a manner that, in ODOT's judgment, "will best serve the interests of the state and will most adequately conserve highway funds." In this case, plaintiffs do not question that ODOT formed the requisite judgment; nor do they seem to dispute that ODOT's transfer of the license to DAS would "best serve the interests of the state." Rather, plaintiffs take aim at the phrase "most adequately conserve highway funds" and argue that "conserve" does not "involve the concept of improving or increasing." "Conserve," plaintiffs argue, means to "preserve from change or destruction." Webster's New Int'l Dictionary 568 (2d ed. 1934).[17] And, plaintiffs contend, Oregon law draws a distinction between "conserving" an asset and "improving" or "increasing" it. See ORS 307.115(4)(c)(A) (application for tax exemption for nonprofit corporation holding property for public parks or public recreation should not be denied if government authority determines granting exemption will "[c]onserve or enhance natural or scenic resources"); ORS 344.420(2) (legislative finding that "[p]ublic bodies that have responsibility for projects to protect, conserve, rehabilitate or improve public lands" are in a position to provide employment and training opportunities to Oregon youth). As plaintiffs see it, the license that ODOT granted to DAS increased or improved the amount per record going to the fund but, by disposing of an asset, it violated ORS 366.395(2).
Plaintiffs are correct that the word conserve means "to preserve from change or destruction," but the more complete definition of that term also includes "[t]o keep in a safe or sound state; to save." Webster's New Int'l Dictionary 568 (2d ed. 1934); see also Webster's New Int'l Dictionary of the **226 English Language 478 (1910 ed.) (defining *1090 verb "conserve"); The Universal Dictionary of the English Language 228 (1957 ed.) (defining verb "conserve" as "[t]o keep safe, to keep, protect, preserve, esp. from waste, loss"). Increasing a fund may be a way to keep that fund in a sound state and preserve the whole from destruction. And, although "conserving" and "improving" may be distinct concepts, as the statutes that plaintiffs cite indicate, they are not mutually exclusive: An agency that improves property also may keep it in a sound state. By adding to the highway fund, ODOT may be both improving and conserving it.
We cannot say, as a matter of law, that ODOT violated ORS 366.395(2) when it formed a judgment that the sale of the license to DAS would most adequately conserve highway funds.
II. THE USE TO WHICH DAS PUTS THE LICENSE
We next turn to plaintiffs' argument that the use to which DAS puts the license violates DAS's trust obligations to the highway fund and Article IX, section 3a of the Oregon Constitution. As noted above, the legislature tasked DAS with creating a state internet portal and, to enable it to do so, permitted DAS or its subcontractor to charge users a convenience fee as a contribution toward the costs of carrying out that task. Former ORS 182.132(3)(a) (2011), renumbered as ORS 276A.276(3)(a) (2018). When DAS subcontracted with NICUSA to create and maintain the state's internet portal, DAS authorized NICUSA to charge users a $3.00 per driver record convenience fee so that NICUSA could recoup its costs in establishing the state internet portal.
Plaintiffs argue that that agreement is impermissible because, as a trustee of the highway fund, DAS must use the fund asset it received-i.e. , the license-to generate gain for the highway fund, not to benefit itself. DAS did not do so, plaintiffs contend, when it used the license that it received from ODOT to obtain funds to create and maintain a state internet portal. Thus, plaintiffs argue that DAS's actions amount to "self-dealing"-a trustee using fund property for the benefit of the trustee, a use that is impermissible and necessarily void. See **227 Restatement (Third) of Trusts § 78(2) (2007) (noting that, with few limited exceptions, a "trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests"); Stephan v. Equitable S. & L. Ass'n , 268 Or. 544, 564, 522 P.2d 478 (1974) ("[A] trustee may not use trust property for his own purposes."); see also 46 Op. Atty. Gen. 506 (1993) (stating that trustee of statutory trust cannot engage in "self-dealing either in the trustee's own interest or the interests of third parties").
Plaintiffs' argument rests on the premise that DAS is a trustee of the highway fund.[18] The problem with that premise is that DAS is not named as a highway fund trustee, and its status as a trustee cannot be implied.
ORS 366.505 is the statute that creates the highway fund trust. As a statutory trust, the highway fund's terms " 'are either set forth in statute or are supplied by the default rules of general trust law.' " See White v. Public Employees Retirement Board , 351 Or. 426, 433-34, 268 P.3d 600 (2011) (quoting *1091 Restatement (Third) of Trusts § 4 comment g (2003) ) (analyzing public employment retirement fund). ORS 366.505 describes the property that makes up the highway fund, notes the fund's independence from the General Fund, and prescribes the fund's permitted uses. The statute does not expressly name a trustee. Given that ODOT holds and may dispose of trust property, the parties **228 agree that ODOT's role as a trustee may be implied.[19] See ORS 366.395 (providing ODOT authority to transfer highway fund property). The parties disagree, however, about whether we also can determine, by implication, that DAS has a similar trustee status or role.
Plaintiffs contend that because the legislature has named specific agencies as trustees in other contexts, the legislature's decision not to name one specific agency to act as trustee of the highway fund indicates an intent to have many agencies serve in that role. Compare ORS 366.505 (no named trustee for highway fund) with ORS 237.960(3) (PERB is trustee of the Public Employees Retirement Fund) and ORS 537.341 (Water Resource Department is trustee of certificates for in-stream water rights). Plaintiffs also argue that (a) other officials and agencies are mentioned in the statutes creating the highway fund, see ORS 366.510 (requiring "[a]ll state officials charged with the collection of highway funds" to "turn [them] over to the State Treasurer"); ORS 366.506(1) (requiring DAS to conduct highway cost allocation study to determine costs users should pay for the maintenance, operation, and improvement of public roads); and (b) executive branch agencies are not independent actors. Each agency exercises power that originates with the Governor and is therefore part of one united entity-the executive branch. Accordingly, plaintiffs contend that agencies are unable to enter into arms-length transactions with one another and that ODOT's sale of the license to DAS did not remove the license from the highway fund and its restrictions. See Jimenez v. Lee , 274 Or. 457, 462, 547 P.2d 126 (1976) (when a trustee converts trust assets in a manner not "solely in the interest of the beneficiary," the assets remain constructively part of the trust).
The shortcoming in plaintiffs' arguments becomes apparent when we explore their consequences. As a general rule, when there is more than one trustee of a trust, all trustees, or at least a majority of the trustees, must agree on how to exercise their powers. See **229 Restatement (Third) of Trusts § 39 comment a (2003) (general rule that a majority of trustees must agree to take action with respect to trust property); Trusts , 76 Am. Jur. 2d § 321 (2018) ("Generally, when the administration of a trust is vested in cotrustees, they all form one collective trustee and must exercise jointly all those powers that call for their discretion and judgment unless the trust instrument provides otherwise." (Footnotes omitted.) ). If plaintiffs are correct that all or many executive branch agencies are trustees of the highway fund, then that would mean that all, or at least a majority, of those many trustees would have to agree on the disposition of highway fund assets. Such a cumbersome mechanism would directly conflict with the statute that grants ODOT alone the authority to sell or lease fund property that ODOT deems to be "no longer needed, required or useful for [ODOT's ] purposes." ORS 366.395(1).
Further, plaintiffs' suggestion that DAS and ODOT are essentially the same because of the "unitary nature" of the executive branch is oversimplified. DAS and ODOT do not share the same responsibilities and purposes. ODOT's purposes relate, in significant part, to carrying out functions pertaining to "drivers and motor vehicles, highways, motor carriers, public transit, [and] rail and transportation safety." ORS 184.615(2)(a). DAS, on the other hand, is tasked with, among other duties, improving "the efficient and effective use of state resources," which includes providing "[g]overnment infrastructure services that can best be provided centrally," like "purchasing, risk management, [and] facilities management." ORS 184.305(1). Although their interests conceivably may overlap at times, to say that ODOT and DAS are fungible *1092 because they both belong to the executive branch overlooks their distinct and bounded purposes. See SAIF v. Shipley , 326 Or. 557, 561, 955 P.2d 244 (1998) (Agencies have "only those powers that the legislature grants and cannot exercise authority that [they do] not have."). We reject plaintiffs' argument that the legislature intended that DAS be a trustee of the highway fund.
We also reject plaintiffs' related argument that the license that ODOT granted to DAS remained an asset of the highway fund after ODOT sold it to DAS. ORS 366.395(2)(a)
**230 provides that all "funds or money derived from the sale or lease" of property that is no longer needed, required, or useful "shall be paid by [ODOT] to the State Treasurer with instructions to the State Treasurer to credit such funds or moneys to the highway fund." As defendants recognize, that directive means that, when ODOT sold the license to DAS, it was the money that ODOT received from that sale that became part of the highway fund. Once transferred to DAS, the license was no longer part of the fund, at least for the term of the license. DAS was therefore free to use the license in ways other than those prescribed in Article IX, section 3a.
III. THE FAIR MARKET VALUE OF THE LICENSE
Finally, we address plaintiffs' argument that, if ODOT was permitted to transfer an exclusive license to DAS, it was required to obtain fair market value for the license and that it did not do so-a violation of Article IX, section 3a.[20] Plaintiffs' argument on this issue is simple: Because NICUSA charges users $9.63 per driver record, the $6.63 per driver record that DAS pays ODOT for its license is not, as a matter law, its fair market value.
That argument, as the Court of Appeals observed, "conflates what ODOT sold to DAS with what NICUSA sells to disseminators: a license for the right to provide commercial electronic access to driver records versus a driver record." Oregon Trucking Assns. , 288 Or. App. at 834, 407 P.3d 849. Many sellers convey property for what they deem to be fair market value in circumstances in which the buyers predictably will resell the property for greater sums. Thus, the purchaser of a license may use that license to generate income over and above the price paid, perhaps because the licensee adds value or because the licensee has access to a different market than did the licensor. That does not mean that the licensee necessarily paid less than fair market value for the license. In this case, defendants obtained an expert opinion as to the fair market value of the license that it sold. As **231 defendants submit, NICUSA may have added value to the license before it sold driver records to disseminators by the way it provides electronic access to those records, such as through software features. But, even if that is not the case, we cannot conclude from the sole fact that NICUSA makes a profit that ODOT sold the license for less than fair market value.
Moreover, ODOT's sale to DAS and DAS's transfer to NICUSA do not conflict with the purposes of Article IX, section 3a. That provision is intended, in large part, to prevent the highway fund from being raided for non-highway purposes and diminished in the absence of a corresponding benefit to state highways. See Rogers v. Lane County , 307 Or. 534, 542, 771 P.2d 254 (1989) (citing 1980 voters pamphlet noting that Article IX, section 3a, was intended "to stop the raid" on the highway fund for nonhighway uses); AAA Oregon/Idaho Auto Source v. Dept. of Rev. , 363 Or. 411, 417, 423 P.3d 71 (2018) (explaining that Article IX, section 3a, was amended in 1980 to remove the ability to use the highway fund monies for "policing" of public roadways and maintaining public parks). The arrangement at issue here did not diminish the highway fund; it increased it.
For those reasons, we reject plaintiffs' argument that ODOT's sale of the license to DAS violated Article IX, section 3a, on the theory that ODOT did not receive fair market value for the license.
*1093 IV. CONCLUSION
In sum, we hold that ODOT lawfully transferred the license in question to DAS and that neither the use to which DAS puts the license nor the value DAS paid for it runs afoul of Article IX, section 3a, of the Oregon Constitution.
The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.[21]

At the time that ORS 802.179(13) was enacted, electronic access was available only to governmental entities. Exhibit C, House Committee on Transportation, HB 2096, Feb. 19, 1997 (written testimony of Bill Seely). Large volume customers most often received records by magnetic tape or computer-to-computer file transfer; the resulting records were not provided until the day after the request was made. Id.

The bill also was instigated by enactment of the Driver's Privacy Protection Act, 18 USC §§ 2721 to 2725 (DPPA), which required each state to review its driver records policies for security purposes. See Exhibit A, Senate Committee on Transportation, HB 2096, May 19, 1997 (written testimony from Rep Barbara Ross explaining DPPA requires states to "revisit its policy concerning access" to personal information in driver records). DPPA was passed in response to incidents like that in which an individual retrieved an actor's address through driver records and killed her in her home. Deborah F. Buckman, Validity, Construction, and Application of Federal Driver's Privacy Protection Act, 18 U.S.C.A. §§ 2721 to 2725 , 183 A.L.R. Fed. 37 § 2 (2003).

One could argue that, because the legislature was concerned with protecting against the disclosure of personal information in driver records, the legislature intended that ODOT provide access to such records in the securest way possible. However, plaintiffs do not make that argument, and, on this record, there is no evidence that electronic access better protects against disclosure than do other ways of providing driver records.

Plaintiffs do not argue that, even if inability to profit can be a consideration under ORS 366.395(1), ODOT's decision that the license was no longer useful was nonetheless invalid.

ORS 802.183 provides:
"The Department of Transportation may establish fees reasonably calculated to reimburse it for its actual cost in making personal information [in driver records] available to a person or government agency authorized under ORS 802.179 to obtain the information."

Plaintiffs also argue that permitting ODOT to use inability to profit as a measure would give ODOT "unfettered discretion" to transfer any trust property, and they use previous Attorney General opinions to illustrate the risk they see. See 48 Op. Atty. Gen. 345 (1997) (stating that it would violate Article IX, section 3a, for ODOT to use highway fund monies to fund start-up and administrative costs of program that generates money for nonhighway purposes); Attorney General Letter of Advice to Robert N Bothman (OP-6329) (June 16,1989) (stating that it would violate Article IX, section 3a, for ODOT to use highway fund money raised from the sale of driver records to cover voter registration expenses). We disagree. Our decision here does not permit ODOT to use trust funds for purposes prohibited by the constitution. Rather, it upholds ODOT's determination that a particular trust asset that ODOT is not required to hold is not needed, required, or useful for department purposes.

The legislature adopted the "Oregon highway code" in 1939, part of which authorized the highway commission to sell or exchange property that it determined to be "no longer needed, required, or useful for highway purposes." Or. Laws 1939, ch. 529, § 15(9). ODOT was created by statute in 1969 and took over functions of the highway commission in 1973, including the power to transfer property that it deemed to be no longer needed, required, or useful. See Or. Laws 1969, ch. 599, § 2 (creating ODOT); Or. Laws 1973, ch. 249, § 27 (abolishing the highway commission and giving its duties to ODOT).

The Court of Appeals did not address whether DAS is in fact a trustee of the highway fund, instead assuming for the sake of argument that it is. Oregon Trucking Assns. , 288 Or. App. at 832, 407 P.3d 849. In that instance, the court determined, DAS nonetheless "could choose a course of action that would benefit both the highway fund *** and the state as a whole." Id. (citing Restatement (Third) of Trusts § 78 comment c(7) (2007) ). Plaintiffs challenge that conclusion, arguing that the authority that the Court of Appeals relied on in reaching its conclusion concerns a deal between two trusts in which the same person or entity serves as trustee to both trusts. See Restatement § 78 comment c(7) ("The duty of loyalty does not preclude trustees in their fiduciary capacity from dealing with other trusts or with decedents' or conservatorship estates, including trusts and estates of which the trustee is a fiduciary."). Plaintiffs argue that there are exceptions to the rule against self-dealing but that those exceptions do not apply here and do not include the exception cited by the Court of Appeals. See Restatement § 78 comment d ("Except as stated in *** Comments c(4)-c(6) or c(8), the duty of loyalty prohibits a trustee from engaging on behalf of the trust in transactions with the trustee personally.").

Defendants argue that, when ODOT granted the license to DAS in exchange for fair market value, it fully complied with its trustee obligations under ORS 366.505. Plaintiffs do not dispute that contention.

Plaintiffs also question whether "fair market value" as opposed to "entire current value" is the correct measure of the lawfulness of the amount DAS paid ODOT for the license. However, plaintiffs do not rest their arguments on that distinction, and we therefore need not address it.

Plaintiffs contend that the Court of Appeals was wrong to hold that NICUSA was a necessary party to the action. Plaintiffs raise that issue in a footnote in their brief on the merits. That argument is not sufficiently briefed, and we therefore decline to address it. See State v. Turnidge , 359 Or. 507, 516 n. 3, 373 P.3d 138 (2016) (declining to address underdeveloped argument).