Argued and submitted September 1, 2015, OAR 291-124-0016(2) held invalid,
Health Policy and Procedure #P-A-02.1 held invalid March 9, 2016

ARLEN PORTER SMITH,
*Petitioner,*

*v.*

DEPARTMENT OF CORRECTIONS,
*Respondent.*

A155103

369 P3d 1213

Tonia L. Moro argued the cause and filed the reply brief for petitioner. Arlen Porter Smith filed the opening brief *pro se.*

Judy C. Lucas, Assistant Attorney General, argued the cause and filed the brief for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Ortega, Judge, and Tookey, Judge.

TOOKEY, J.

**TOOKEY, J.**

Petitioner challenges the validity of a rule adopted by the Department of Corrections (DOC), OAR 291-124-0016(2), requiring the clinical director of DOC's Health Services to appoint the chief medical officer for each DOC institution. Petitioner also challenges the validity of DOC's "Health Policy and Procedure #P-A-02.1" (health policy), which purports to explain levels of health care services provided to inmates, as defined in OAR 291-124-0041. According to petitioner, the rule is invalid because it exceeds DOC's statutory authority, and the health policy is invalid because it constitutes a "rule," for which DOC failed to comply with rulemaking procedures. We agree on both points and, therefore, conclude that OAR 291-124-0016(2) and the health policy are invalid.

Our review of both the rule and the health policy is governed by ORS 183.400. "Under ORS 183.400(1), 'any person' may petition this court to determine the validity of a rule." *Assn. of Acupuncture v. Bd. of Chiropractic Examiners*, 260 Or App 676, 678, 320 P3d 575 (2014). The legal basis of a rule challenge, though, is limited. "In reviewing a rule challenge under [ORS 183.400,] we may declare the rule invalid only if we conclude that it violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without complying with rulemaking procedures. ORS 183.400(4)." *Id.* Petitioner's challenges to the rule and the health policy fit within the limited parameters of our review. Petitioner contends that: (1) the provisions of OAR 291-124-0016(2) directly conflict with the provisions of a statute, and therefore, the rule exceeds the statutory authority of DOC; and (2) the health policy, although purportedly written to explain the provisions of an existing rule, amplifies and refines that rule, and therefore constitutes a "rule" that was not adopted in compliance with rulemaking procedures. We consider each challenge separately.

OAR 291-124-0016 pertains to healthcare services provided to DOC inmates. It provides that the "Health Services administrator" directs healthcare services, OAR 291-124-0016(1), and that the "Health Services clinical

director" directs "professional oversight of clinical health-care providers," OAR 291-124-0016(2). Subsection (2) provides, in full:

"The Health Services clinical director is responsible for professional oversight of clinical healthcare providers. *The clinical director has authority for all decisions requiring medical judgment and directly affecting outcomes of clinical practice. The clinical director shall appoint a chief medical officer to provide oversight for professional clinical services to inmates for each DOC institution.*"

(Emphasis added.)

Petitioner argues that subsection (2) is in direct contravention of ORS 179.360(1)(f). ORS 179.360(1)(f) is part of a series of statutes pertaining to the superintendents of institutions administered by the Oregon Health Authority (OHA) and DOC. It provides:

"(1)   Each superintendent shall:

"* * * * *

"(f)   Designate a physician licensed by the Oregon Medical Board to serve as chief medical officer, who will be directly responsible to the superintendent for administration of the medical treatment programs at the institution and assume such other responsibilities as are assigned by the superintendent."

Petitioner contends that OAR 291-124-0016(2) "attempts to alter the statutory structure of responsibility for prisoner health care at state prison facilities." He asserts that DOC cannot require the clinical director of its centrally organized Health Services to appoint and oversee a DOC institution's chief medical officer, where the legislature has required the superintendent of each respective institution to appoint and oversee the institution's chief medical officer. DOC responds that there is no conflict between the rule and the statute.

"It is elementary that, when an administrative rule cannot be reconciled with a statute, it is the statute that controls." *State v. Newell*, 238 Or App 385, 392, 242 P3d 709 (2010). Furthermore, for purposes of ORS 183.400(4)(b), a

rule is deemed to exceed its statutory authority not only if it exceeds the express or implied authority of the statutes that the rule purports to implement, but also if the rule "contravene[s] some other applicable statute." *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984); *see State ex rel Engweiler v. Felton*, 350 Or 592, 627, 260 P3d 448 (2011) (finding that rules pertaining to parole consideration for juveniles convicted of aggravated murder, which required such juveniles to undergo an intermediate hearing process before they could become eligible for parole, were invalid because they conflicted with statutes that required all inmates to receive a parole hearing and an initial release date).

There is no significant disagreement between the parties about the meaning of OAR 291-124-0016(2). Under its provisions, the Health Services clinical director has authority over "all decisions requiring medical judgment" and appoints the chief medical officer for a DOC institution. The parties, however, disagree about the meaning of ORS 179.360(1)(f) and whether it mandates that the superintendent of a DOC institution appoint and supervise the institution's chief medical officer. In determining the legislature's intent in a statute, we apply the statutory interpretation analysis of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), examining the text of the statute in context—including related statutes—and examining any relevant legislative history. *Gaines*, 346 Or at 171-72; *PGE*, 317 Or at 610-11.

As already noted, ORS 179.360(1)(f) is part of a series of statutes—ORS 179.310 to 179.370—pertaining to the superintendents of certain state institutions. "Superintendents" are defined in ORS 179.310 as "the executive heads" of the institutions operated by the OHA and those operated by DOC. *See also* ORS 179.321. Consequently, a "superintendent" under ORS 179.360(1)(f) includes DOC superintendents. Therefore, we agree with petitioner that, on its face, ORS 179.360(1)(f) applies to DOC and mandates that DOC superintendents appoint and supervise the chief medical officer for their respective institutions.

DOC argues that, regardless of the language of ORS 179.360(1)(f), the provisions of OAR 291-124-0016 relating to the appointment of an institution's chief medical officer are authorized by ORS 423.075.[1] That statute provides, in pertinent part:

"(1)  The Department of Corrections shall be under the supervision and control of a director who is responsible for providing for programs for the delivery to the public of the services assigned to the department, and for undertaking long-range planning necessary for the effective and efficient delivery of these services.

"* * * * *

"(5)  The Director of the Department of Corrections shall:

"(a)  For purposes of administration and control, and with the approval of the Governor, organize and reorganize the department in whatever manner the director deems necessary to conduct the work of the department.

"(b)  Appoint all subordinate superintendents, officers and employees, whether classified or unclassified, of the department, prescribe their duties and fix their compensation, subject to applicable provisions of the State Personnel Relations Law.

"(c)  Delegate to departmental employees such responsibilities and authority as the director determines to be necessary[.]"

DOC argues that, because ORS 423.075 gives the DOC director authority to delegate "responsibilities and authority * * * as [it] determines to be necessary," DOC was within its statutory authority to delegate to its clinical director the responsibility to appoint a chief medical officer for each institution. We disagree. Although ORS 423.075 grants the DOC *director* authority to delegate responsibilities and authority, ORS 179.360(1)(f) specifically requires the *superintendent* to appoint the chief medical officer for the superintendent's institution. Thus, the broad delegative authority of the director is inapposite. In ORS 179.360(1)(f), the legislature carved out a particular exception to the

---

[1] ORS 423.075 is one of the statutes that OAR 291-124-0016 implements.

general authority granted to the director in ORS 423.075, and it is the particular intent in ORS 179.360(1)(f) that controls. *See* ORS 174.020(2) ("When a general and particular provision are inconsistent, * * * a particular intent controls a general intent that is inconsistent with the particular intent."); *Powers v. Quigley,* 345 Or 432, 438, 198 P3d 919 (2008) ("[I]f two statutes are inconsistent, the more specific statute will control over the more general one.").[2] Because OAR 291-124-0016(2) contravenes ORS 179.360(1)(f), it is invalid.

Petitioner also challenges the validity of the health policy that "establishes the method and guidelines used to determine whether treatment will or will not be provided [to inmates] by DOC." Health Policy and Procedure #P-A-02.1. Petitioner argues that the health policy constitutes a rule that was not adopted under proper rulemaking authority and is, therefore, invalid. ORS 183.400(4). DOC contends that the health policy merely explains the provisions of an existing rule, OAR 291-124-0041(1), and, therefore, the health policy was not subject to rulemaking procedures.

OAR 291-124-0041(1) provides, in pertinent part:

"Health care and treatment is authorized and provided according to priorities established by the clinical director and is subject to peer review.

"(a)  Level 1:

"(A)  Medically mandatory is care and treatment that is essential to life and health, without which rapid deterioration may be an expected outcome and where medical/ surgical intervention makes a very significant difference.

"(B)  Level 1 care and treatment shall be routinely provided to all inmates by the department. Any DOC licensed health professional may authorize care and treatment of Level 1 conditions.

"(b)  Level 2:

"(A)  Presently medically necessary is care and treatment without which an inmate could not be maintained

---

[2] DOC makes other arguments about the validity of OAR 291-124-0016(2). We reject them without further discussion.

without significant risk of either further serious deterioration of the condition or significant reduction in the chance of possible repair after release or without significant pain or discomfort.

"(B) Level 2 care and treatment may be provided to inmates subject to periodic utilization review by the chief medical officer. Any treating practitioner may authorize care and treatment of Level 2 conditions.

"(c) Level 3:

"(A) Medically acceptable but not medically necessary is care and treatment for non-fatal conditions where intervention may improve the quality of life for the inmate.

"(B) Level 3 care and treatment may or may not be authorized based upon review of each case. Only the clinical director and as delegated, the chief medical officer, may authorize or deny care and treatment of Level 3 conditions.

"(d) Level 4: Of limited medical value is care and treatment which may be valuable to a certain individual but is significantly less likely to be cost effective or to produce substantial long term improvement. Level 4 care and treatment will not be routinely provided to inmates by the department."

The health policy establishes these same four levels of medical care defined in OAR 291-124-0041(1), and explains when treatment will be authorized under each care level. Level 1 care is routinely provided by DOC medical personnel. Level 2 care may be authorized by a DOC medical care provider, but is subject to periodic review by the medical director. Level 3 care may be provided or may be referred to the medical director, who can either approve or deny care, or form a review committee to determine, after consideration of nine factors, whether the medical service should be provided. Level 4 care is not routinely authorized.

In addition to defining each care level with language similar to that found in OAR 291-124-0041(1), the health policy gives examples of the types of medical conditions that fall within the definition. For example, the health policy defines Level 1 care as follows:

"Care that is essential to life and health without which rapid deterioration may be an expected outcome and where medical surgical intervention makes a very significant difference and/or has a very high cost effectiveness."

The health policy then gives examples of Level 1 care, such as "appendectomy for appendicitis, repair of deep open wound in neck, * * * burn treatment, treatment for severe head injuries, * * * [and] maternity care."

The health policy also requires that any procedure exceeding $50,000 in cost must be reviewed by a "Therapeutic Levels of Care (TLC)" committee.

Petitioner argues that the health policy goes well beyond a mere explanation of the provisions of OAR 291-124-0041 and, therefore, constitutes a rule. In particular, petitioner singles out the following provisions in the health policy: (1) the examples of medical conditions attached to each level of care definition; (2) the additional factors that the review committee is to consider in determining whether to authorize a medical condition falling under Level 3 care; and (3) the provisions requiring the TLC committee to review any medical procedure exceeding $50,000.

Our review of the health policy is limited to determining whether the health policy is a "rule" within the meaning of ORS 183.310(9). If it is a rule, then it may be invalid if it was not implemented through "proper procedures." *Burke v. Children's Services Division*, 288 Or 533, 538, 607 P2d 141 (1980).

Under the pertinent provisions of ORS 183.310(9), a rule is:

"any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency. The term * * * does not include:

"(a) * * * internal management directives * * * which do not substantially affect the interests of the public:

"* * * * *

"(B) Within an agency, between its officers or between employees[.]"

The parties agree that the health policy constitutes a "directive, standard, regulation or statement." Further, the health policy has general applicability, as it applies to all inmates who receive or may need to receive medical care while incarcerated. *See Smith v. Board of Parole*, 250 Or App 345, 350-51, 284 P3d 1150 (2012) (holding that a notice-of-rights form that "plainly affects more than one person and encompasses more than an immediate set of facts," and is "applicable * * * to all inmates in a particular category," is a rule). The parties disagree about whether the health policy "implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). We conclude that it does.

Our case law provides instruction in determining whether the health policy constitutes a rule. In *Wehrman v. Public Welfare Div.*, 24 Or App 141, 143, 544 P2d 606, *rev den* (1976), the petitioner sued a state agency when it reduced his public assistance grant based on the agency's determination that his federal income tax rebate was income that should be considered in determining the petitioner's need for assistance. The agency's determination was based on an "executive bulletin" that required a person's income tax rebate "be considered * * * income." *Id.* An existing rule defined "income" for purposes of determining a person's need for assistance, and there was no dispute that the tax rebate fit within the definition of income. *Id.* We held that the executive bulletin need not have been adopted as a rule, because it was "at most an 'internal management directive' or an 'intra-agency memorand[um]'" and exempt from rulemaking procedures. *Id.*[3] The "actual basis for the administrative action was [the rule's] general definition of income." *Id.*

In another case, *Clark v. Pub. Wel. Div.*, 27 Or App 473, 475, 556 P2d 722 (1976), the petitioner was the recipient of food stamps and argued that the state agency had relied on an invalid provision in an agency manual when it refused

---

[3] *Smith v. TRCI*, 259 Or App 11, 312 P3d 568 (2013), presented a similar issue. The petitioner in that case argued that a newsletter that announced a change in DOC rules was a rule that should have been adopted through rulemaking procedures. *Id.* at 15. We held that the newsletter's "pronouncement of the necessary effect of valid rules * * * [was] not itself a rule that was subject to the formalities of rulemaking." *Id.* at 17.

to deduct from her income, food and lodging expenses she incurred when she and her daughter traveled from Coos Bay to Portland for the daughter to receive treatment for her medical condition. A rule provided that, in determining income, payments for medical costs could be deducted. *Id.* at 476. The agency manual instructed the agency to deduct "[a]ctual medically-related Transportation costs (Expenses for lodging or meals in connection with medical appointments or services are not an authorized deduction unless incurred at a medical facility.)." *Id.* at 475-76. The petitioner argued that the provision in the manual limiting lodging or meal expenses should have been adopted through the agency's rulemaking procedures. *Id.* at 475. We agreed:

> "The term 'medical expenses' expressed in [the existing rule] is not a self-defining term, there are numerous medically-related expenses which are arguably deductible. The definition and amplification of this term thus becomes crucial.
>
> "* * * These policy decisions affect members of the general public applying for food stamps and do not relate solely to the food stamp eligibility workers as employees of the agency. * * * If they are utilized as a basis for determining food stamp entitlement they must be properly adopted rules."

*Id.* at 476-77.

We explained in *Burke v. Pub. Wel. Div.*, 31 Or App 161, 165, 570 P2d 87 (1977), the relationship that must exist between an existing rule and an "unpromulgated directive" for an agency to utilize such a directive without first adopting it through rulemaking procedures. Noting the difference in results between *Wehrman* and *Clark*, we said:

> "The distinction between *Wehrman* and *Clark* seems to be that in the former case the unpromulgated directive explained what was necessarily required by the existing rules, whereas in the latter case the directive was a policy-based interpretation of choice of an existing rule which could have been otherwise construed. The principle which emerges from these two cases is that an agency's pronouncement of how a validly promulgated rule operates in a specific context need not itself be promulgated as a rule if the existing rule necessarily requires the result set forth in that pronouncement. There is no reason to require the

formalities of rulemaking whenever an agency undertakes to explain the necessary requirements of an existing rule. However, the interpretive amplification or refinement of an existing rule is a new exercise of agency discretion and must be promulgated as a rule under the APA to be valid."

*Id.*

Under that case law, we agree with petitioner that the health policy sets forth more than what OAR 291-124-0041 necessarily requires.

As was the case in *Clark*, the phrases used in OAR 291-124-0041(1) to explain the levels of care are not "self-defining." 27 Or App at 476. The rule defines levels of care in a manner that requires health care providers to make judgments with certain general criteria in mind. In contrast, by adding examples to the level of care definitions, the health policy refines the general criteria found in the rule definitions. The effect of the examples is to direct the health services personnel to interpret the general criteria consistent with the examples given.

Similarly, by adding nine additional factors for a review committee to consider before authorizing Level 3 care, the health policy refines the rule's general requirement that Level 3 care be authorized on a case-by-case basis. The result is that the committee, and even health care providers making decisions about Level 3 medical procedures, will authorize, not on a case-by-case basis as the existing rule requires, but consistent with the nine additional factors listed in the health policy. Applying our reasoning from *Burke*, 31 Or App at 165, noted above, neither the examples attached to each definition nor the nine additional factors considered in authorizing Level 3 care are necessarily required by the provisions of OAR 291-124-0041(1).

The petitioner is also correct that the provision requiring the TLC committee to review any procedure exceeding $50,000 is a refinement of the rule, if not an outright addition to the rule. The rule itself mentions cost of procedure only once—defining Level 4 care as "valuable to a certain individual but * * * significantly less likely to be cost effective or to produce substantial long term improvement."

Other than that reference, there is nothing in the provisions of OAR 291-124-0041(1) that indicates any limitation on a procedure based on the fact that its cost exceeds a particular dollar amount. In light of the fact that these health policy provisions amplify and refine the provisions of OAR 291-124-0041(1), *Burke*, 31 Or App at 165, we agree with petitioner that the health policy is a rule as defined in ORS 183.310(9).

Nonetheless, DOC argues that the health policy is an exception to the rule definition, because it is an "internal management directive which [does] not substantially affect the interests of the public" and was adopted "within [the] agency between its officers or between employees." ORS 183.310(9)(a) and (b). In making its argument, DOC relies on this court's holding in *Rogue Flyfishers v. Water Policy Review Bd.*, 62 Or App 412, 417, 660 P2d 1089 (1983), that internal management directives have two main characteristics:

"First, they affect individuals solely in their capacities as members of the agency involved rather than as members of the general public who may have occasion to deal with the agency. Second, they are not self-executing. In other words, the agency must take some step beyond the mere establishment of the directive before any public or private interest is directly affected."

(Internal quotation marks and citation omitted.) DOC argues that the health policy only affects DOC employees in their capacities as DOC employees, and DOC must take some step beyond merely establishing the policy before a public or private interest is affected.

In *Rogue Flyfishers*, the Water Policy Review Board had voted to instruct its staff to base future stream flow computations on the amount of water present in a given stream 80 percent of the time. *Id.* at 414. Statutory authority empowered the board to establish minimum stream flows, so the issue on appeal was whether the computation instruction to the board staff was a rule that should have been adopted through rulemaking procedures. We concluded that the board's action was an internal management directive not subject to the rulemaking requirement, reasoning as follows:

> "Here, the Board's vote to instruct its staff to employ a particular methodology does not affect anyone but the staff, and the impact on staff members is confined to the performance of their jobs. Second, the Board's action will have no effect on public or private interests unless the Board takes some further action, like the establishment of a minimum stream flow, based on the information generated through the staff's use of the 80 percent figure."

*Id.* at 417.

Unlike the board's vote in *Rogue Flyfishers*, the health policy, as applied, has a direct effect on persons other than DOC employees. It directly affects the inmate and whether the health care provider will provide medical treatment.[4] Furthermore, there is no further action necessary, as in *Rogue Flyfishers*, before the health policy affects an inmate. A health care provider either provides or refuses to provide a medical procedure based on the provisions of the health policy.

We therefore conclude that the health policy constitutes a rule and not an internal management directive. Therefore, the DOC should have followed rulemaking procedures in adopting the health policy. Because the DOC did not adopt the health policy as a rule, the health policy is invalid.

OAR 291-124-0016(2) held invalid; Health Policy and Procedure #P-A-02.1 held invalid.

---

[4] *See Burke v. Children's Serv. Div.*, 26 Or App 145, 151-52, 552 P2d 592 (1976) (holding that the Children's Services Division decision to stop making child care payments for recipients of public assistance was not an internal management directive, because the decision did not affect "individuals solely in their capacities as members of the agency involved"; the plaintiff "and others similarly situated were entitled to proper notice and an opportunity to be heard before [Children's Services Division] or the Department of Human Resources could issue a rule terminating the program of direct child-care payments"); *Gray Panthers v. Pub. Wel. Div.*, 28 Or App 841, 844, 561 P2d 674 (1977) (holding that the defendant's internal office memorandum directing staff to deny all new applications for "adult services" programs was not an internal management directive, because the impact on the public was direct; "persons seeking benefits * * * are denied benefits").