TOOKEY, J.
*191 Petitioner, an inmate at Two Rivers Correctional Facility, challenges the validity of certain policies and administrative rules adopted by respondent, the Department of Corrections (DOC). For the reasons explained below, we conclude that the challenged policies that govern searches of dreadlocks and Native American medicine bags are not rules subject to the formalities of rulemaking because the policies set forth how DOC's validly adopted rules governing searches of religious and spiritual items, including hair and garments, necessarily operate in specific contexts; therefore, we lack jurisdiction to review the validity of either policy under ORS 183.400. Furthermore, we *331 conclude that the challenged rules that reference the assignment of an "initial custody level" to inmates entering the prison system based on a Violence Predictor Score are valid.
I. STANDARD OF REVIEW
Our review of administrative rules is governed by ORS 183.400. "Under ORS 183.400(1), 'any person' may petition this court to determine the validity of a rule." Assn. of Acupuncture v. Bd. of Chiropractic Examiners , 260 Or. App. 676, 678, 320 P.3d 575 (2014). "In reviewing a challenge under [ ORS 183.400,] we may declare the rule invalid only if we conclude that it violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without complying with rulemaking procedures." Id . (citing ORS 183.400(4) ).
II. SEARCHES OF DREADLOCKS AND NATIVE AMERICAN MEDICINE BAGS
Petitioner challenges the validity of two DOC policies describing guidelines and procedures for searching inmates' dreadlocks and Native American medicine bags, DOC Policy 90.2.1 and DOC Policy 90.2.2, respectively.[1] Petitioner contends that those policies are rules that DOC adopted without complying with applicable rulemaking procedures.
*192 A. Searches of Dreadlocks
Petitioner argues that DOC policy 90.2.1, which outlines the procedure for searching dreadlocks, is a rule that DOC adopted without complying with applicable rulemaking procedures because the "religious sincerity test" mentioned in OAR 291-041-0020 is, pursuant to DOC Policy 90.2.1, to be conducted by the prison chaplain, and "[n]o formally adopted rule requires or even suggests this delegation of responsibility." OAR 291-041-0020(9) (outlining procedures for searches of an inmate's hair, and providing for a "religious sincerity test" to determine what further action shall be taken if the "hair creates a significant security or operational concern"); DOC Policy 90.2.1.III.B.2. (the chaplain conducts the "religious sincerity test"). We disagree with petitioner.[2]
First, we give a brief overview of the statutes regarding DOC's rulemaking authority and the statutes and rules regarding DOC's chaplains. Under ORS 179.375, DOC "shall ensure that adequate chaplaincy services, including but not limited to Protestant and Roman Catholic, are available at their * * * institutions" and, with respect to the inmates at such institutions, the chaplains must "[p]rovide for and attend to their spiritual needs," visit "them for the purpose of giving religious and moral instruction," and "[p]articipate in the rehabilitation programs affecting them." ORS 423.075(5)(b) and (c) provide, in part, that the director of DOC shall "[a]ppoint all subordinate * * * employees * * * of the department," "prescribe their duties," and "[d]elegate to departmental employees such responsibility and authority as the director determines to be necessary[.]" See Smith v. Dept. of Corrections , 276 Or. App. 862, 866-67, 369 P.3d 1213 (2016) (discussing the broad delegative authority granted to the director under ORS 423.075 when no statutory authority prohibits the director's delegation of the particular responsibilities or authority at issue). In addition, the director may "adopt rules for the government and administration of the department," including those related to chaplains.
*193 ORS 423.075(5)(d) ; see also ORS 179.040(1)(d) (DOC shall "[m]ake and adopt rules for the guidance of [DOC] and for the government of [its] institutions.").
A chaplain is defined as a "person employed by [DOC] to facilitate and provide religious programming and services to inmates in [DOC] facilities." OAR 291-143-0010(2) ; see also OAR 291-117-0008 (defining a staff chaplain as "[a] person employed full-time *332 or contracted by *** [DOC] to provide religious services to inmates in [DOC] facilities").[3] Because the chaplain is a person employed by DOC, and because no statutory authority prohibits the director's delegation of the authority and responsibilities at issue to the chaplain, the director can delegate that authority and those responsibilities to the chaplain as the director deems necessary.
Next, we give an overview of DOC's rules related to the chaplain's authority and responsibilities. OAR 291-143-0070 provides, in part, that a "chaplain in each [DOC] facility is responsible for coordination and facilitation of inmate religious activities" and that "[c]haplains shall attend to the religious requests of each inmate, regardless of the inmate's religious belief or affiliation." Furthermore, it is the stated policy of DOC to "establish department policy and procedures regarding inmate religious exercise and activities" and to "[p]rovide for the orderly management and supervision of inmate religious activities through the use of chaplains" that is within "the inherent limitations of resources and the need for facility security, safety, health and order." OAR 291-143-0005. See also OAR 291-143-0100 ("Items required for the conduct of a religious activity *** must be approved by the chaplain, may require security review, and are subject to search. Items not approved will be considered contraband and subject to confiscation."); OAR 291-143-0110 ("An inmate may be authorized to express his/her religious customs and beliefs in appropriate ways, consistent with facility security, safety, health and order through the use of approved religious items," and DOC "staff will treat all *194 inmate religious property items with respect and will not destroy inmate religious property items without first consulting with the chaplain"); OAR 291-143-0120(1) ("All designated religious activity areas and religious items shall be subject to search conducted in accordance with the department's rule on Searches (Institutions) (OAR 291-041)," and staff "shall conduct searches in a manner that reflects an awareness of and sensitivity to individual religious beliefs, practices, and respect for the objects or symbols used in the religious practice.").
The statutes and rules set forth above demonstrate that, under ORS 423.075, the director may, and has, validly delegated the responsibility to provide for the orderly supervision, management, and approval of religious activities and items for religious practices to a departmental employee, the chaplain. OAR 291-143-0005. Additionally, that delegation of authority to the chaplain helps to ensure that other DOC staff comply with the requirement that searches involving religious items, including hair, be conducted in a manner that "reflects an awareness of and sensitivity to individual religious beliefs, practices, and respect for the authorized objects, symbols, and hairstyles used in the religious practice." OAR 291-041-0016 ; OAR 291-143-0110(7) (DOC "staff *** will not destroy inmate religious property items without first consulting with the chaplain.").
As explained below, the following DOC rules, considered as a whole, and the director's delegation of authority to the chaplain to supervise, manage, and approve religious activities and items, "necessarily require[ ]" the chaplain to administer the religious sincerity test. Smith v. TRCI , 259 Or. App. 11, 17, 312 P.3d 568 (2013). With regard to the religious sincerity test, DOC Policy 90.2.1.III.B. provides:
"B. Procedures for Conducting the Search
"1. When conducting a search of an inmate with dreadlocks, staff shall first ask the inmate if he or she is a practicing Rastafarian and if not, are dreadlocks being worn as part of the inmate's spiritual or religious tradition. If the inmate answers in the affirmative, staff must take into consideration the religious and spiritual significance of the dreadlocks.
*195 "2. Religious Sincerity Test:
"a. If time and circumstances permit, staff should suspend the search and request the chaplain to conduct a sincerity *333 test with the inmate. The chaplain shall decide, in consultation with the Administrator of Religious Services, if there is a legitimate interest to be accommodated .
"b. If the chaplain determines there is no religious significance to the dreadlocks, staff may direct the inmate to take the necessary steps to make the hair easily searchable, including the cutting of the dreadlocks.
"c. If time and circumstances do not permit a sincerity test, staff shall proceed as if there is a religious significance to the wearing of the dreadlocks.
"(1) After the search, staff shall ask a chaplain to conduct the sincerity test. The chaplain shall make a decision in consultation with the Administrator of Religious Services about whether the dreadlocks need to be accommodated in the future.
"(2) The chaplain shall make a note in the inmate's file whether or not the accommodation was approved ."
(Emphases added.) As such, in conducting the "religious sincerity test," the chaplain determines "if there is a legitimate religious interest to be accommodated" before "staff may direct the inmate take the necessary steps to make the hair easily searchable, including the cutting of the dreadlocks." Id .
That religious sincerity test is consistent with the chaplain's responsibilities under OAR 291-143-0115, which delegates the responsibility to the chaplain and the Administrator of Religious Services to decide whether DOC should make a "religious accommodation" for an item. OAR 291-143-0115 provides:
"(1) An inmate may make a request for religious accommodation for the following:
"* * * * *
"(b) A religious item not currently approved by the department[.]
"* * * * *
*196 "(2) The inmate shall submit the request for religious accommodation by writing to the facility chaplain or designee. The inmate shall clearly state the *** religious item *** requested.
"(3) The chaplain or designee will review the request to determine if it is covered by established rule or operational practice and respond to the inmate accordingly.
"(4) If the religious *** item *** is not covered by rule or operational practice, the chaplain or designee will have the inmate fill out a Religious Accommodation Request form (CD1571). The inmate must complete the form in the presence of the chaplain or designee.
"(5) The chaplain or designee may conduct an interview with the inmate to gain a better understanding of the inmate's specific request and to clarify the inmate's written responses.
"(6) The chaplain or designee will evaluate the request, and send written comments, together with the Religious Accommodation Request form and any necessary documents, to the Religious Services administrator.
"(7) The Religious Services administrator shall review the documents, and either approve or deny the inmate's request. The facility chaplain or designee and the inmate will be informed once a decision has been made."
See also OAR 291-143-0070(2) ("Chaplains shall attend to the religious requests of each inmate.").
Accordingly, when such a request is made, the chaplain must determine whether the item qualifies for a religious accommodation under a DOC rule or operational practice and, if the item qualifies for a religious accommodation, "respond to the inmate accordingly." OAR 291-143-0115 ; see also OAR 291-041-0016 (providing that "authorized religious or spiritual items *** includ[e] hair"); DOC Policy 90.2.1.III.A.1 ("The wearing of dreadlocks is an approved religious practice for Rastafarians. Dreadlocks may be approved for other religious or spiritual traditions."). Conversely, if the chaplain determines that the item is not covered by a rule or operational practice as a religious item, the chaplain must decide whether to approve such an accommodation, in consultation with the Religious Services *197 administrator. OAR 291-143-0115(4)-(7). Moreover, the religious sincerity test is also consistent with the chaplain's authority to "conduct an interview with *334 the inmate to gain a better understanding of the inmate's specific request and to clarify the inmate's written responses" to determine whether an inmate's hair should be approved for a religious accommodation. OAR 291-143-0115(5).
Additionally, such a religious accommodation determination by the chaplain is also compelled by the chaplain's responsibility under OAR 291-143-0100 to approve "[i]tems required for the conduct of a religious activity." See also OAR 291-117-0080(1)(g) (each inmate may only possess religious "[i]tems [that have been] authorized for religious use by [an] inmate in accordance with the rule on Religious Activities (Inmate) (OAR 291-143) that are purchased through the canteen or authorized in writing by the staff chaplain"); OAR 291-011-0050(8) ("Disciplinary-segregated inmates will be permitted religious items as approved by the chaplain and security manager in accordance with the rule on Religious Activities (OAR 291-143).").
Finally, the policy to have the chaplain administer a religious sincerity test before DOC staff can compel an inmate to cut off dreadlocks is necessitated by OAR 291-143-0110(7), which provides that DOC "staff will treat all inmate religious property items with respect and will not destroy inmate religious property items without first consulting with the chaplain." See also OAR 291-143-0100 (religious "[i]tems not approved [by the chaplain] will be considered contraband and subject to confiscation"); DOC Policy 90.2.1.III.B.2.b. ("If the chaplain determines there is no religious significance to the dreadlocks, staff may direct the inmate to take the necessary steps to make the hair easily searchable, including the cutting of the dreadlocks.").
Thus, the legislature provided that the director of DOC may delegate responsibilities and authority to DOC employees as the director deems necessary, which includes having the chaplain supervise, manage, and approve religious items. That delegation of authority to the chaplain over religious items, noted above in various DOC rules, "necessarily require[ ]," Smith , 259 Or. App. at 17, 312 P.3d 568, the chaplain to *198 administer the "religious sincerity test," pursuant to DOC Policy 90.2.1, to decide whether an inmate's hair requires a religious accommodation, and that delegation of authority also ensures that DOC staff comply with the mandate that they "shall conduct the search [of an inmate's hair] if possible in the least intrusive manner." OAR 291-041-0020(9) ; see id . ("Based on the results of the sincerity test, the functional unit manager or designee will determine what further action shall be taken" and "[a]t no time shall staff cut an inmate's hair to complete a search WITHOUT approval of the functional unit manager or officer of the day."); DOC Policy 90.2.1.III.B.3. (DOC "staff shall not order or otherwise take any action that requires an inmate to cut or permanently remove his/her dreadlocks or any portion thereof, without the prior approval of the superintendent or officer-of-the-day" and, if there is a religious or spiritual significance to the dreadlocks, the dreadlocks may only be cut by the inmate or DOC staff if DOC staff has discovered, by less intrusive means, that the dreadlocks contain suspected contraband).
As such, DOC policy 90.2.1 is not subject to the formalities of rulemaking, because that policy merely "undertakes to explain the necessary requirements of [DOC's] existing rule[s]." Smith , 259 Or. App. at 17, 312 P.3d 568 (internal quotation marks omitted).
B. Searches of Native American Medicine Bags
For the same reasons, we also reject petitioner's argument that DOC Policy 90.2.2 "amplifies respondent's rules governing searches and covers entirely new ground." We conclude that DOC Policy 90.2.2 is not a "rule" under ORS 183.310(9), because DOC's policy outlining the procedures for searching inmates' Native American medicine bags "explain what is necessarily required by the existing rules" governing searches of religious and spiritual items. Smith , 259 Or. App. at 17, 312 P.3d 568 (brackets and internal quotation marks omitted). See OAR 291-041-0016 (outlining procedures for searches of "authorized religious or spiritual items (including *** garments worn)" and requiring *335 that searches be conducted in a manner that "reflects an awareness of and sensitivity to individual religious beliefs, practices, and *199 respect for the authorized objects, *** used in the religious practice"); OAR 291-143-0120 (staff shall conduct searches of religious items "in a manner that reflects an awareness of and sensitivity to individual religious beliefs, practices, and respect for the objects or symbols used in the religious practice"); DOC Policy 90.2.2.III.B.1. (searches of Native American medicine bags "shall be conducted in a manner that reflects an awareness for and sensitivity to individual religious or spiritual beliefs *** and with respect for the objects or symbols used in the religious practice").
C. Conclusion
In sum, DOC Policy 90.2.1 and DOC Policy 90.2.2 express the director's valid delegation of authority to the chaplain over religious items and explain the necessary requirements of the rules related to the orderly supervision, management, and approval of religious items and accommodations for those items in the specific context of searching inmates' dreadlocks or Native American medicine bags. Therefore, we conclude that the challenged policies are not rules subject to the formalities of rulemaking, and we lack jurisdiction to review the validity of either policy under ORS 183.400. See Smith v. Oregon Corrections Enterprises , 290 Or. App. 568, 569, 412 P.3d 276 (2018) (concluding that the court lacked jurisdiction under ORS 183.400 to review an administrative policy because the policy was not a "rule" as defined by ORS 183.310(9) ); see Smith , 259 Or. App. at 17, 312 P.3d 568 (an "agency's pronouncement of how a validly promulgated rule operates in a specific context need not itself be promulgated as a rule if the existing rule necessarily requires the result set forth in that pronouncement" (emphasis in original, internal quotation marks omitted)).
III. DOC'S USE OF A VIOLENCE PREDICTOR SCORE TO CALCULATE AN INMATE'S INITIAL CUSTODY LEVEL
Next, petitioner challenges certain rules that address the assignment of an "initial custody level" to inmates entering the prison system based on a Violence Predictor Score (VPS), which DOC calculates using a mathematical equation that DOC has not made publicly available. According to petitioner, the rules are invalid because they refer to a *200 "published standard"-the equation used to calculate an inmate's VPS-that DOC has not filed with the office of the Secretary of State, or identified the location of the standard and the conditions of its availability to the public, as required by ORS 183.355. For the reasons explained below, we conclude that the challenged rules are valid.
To comply with the rulemaking procedures set forth in ORS 183.355(2), an agency must file a copy of any "published standards" incorporated by reference into an adopted rule with the Secretary of State's office or, if the published standards are "unusually voluminous and costly to reproduce," the agency may identify "the location of the standards so incorporated and the conditions of their availability to the public" in the rule itself.[4]
Petitioner contends that "[t]he VPS is obviously a set of standards employed to make determinations regarding prisoners' custody levels," and that DOC failed to comply with applicable rulemaking procedures when it adopted rules that incorporate by reference the VPS without providing access to the equation that DOC uses to calculate an inmate's VPS in the manner described in ORS 183.355(2). DOC responds that the equation *336 used to calculate an inmate's VPS has not been "published," and, therefore, is not a "published standard" that is subject to that statutory requirement.
Petitioner challenges three DOC rules: (1) OAR 291-104-0116, which provides, in part, that DOC "shall assign inmates an initial custody level in accordance with the Custody Classification Guide *** or the inmate's Violence Predictor Score, whichever is higher," and that the VPS "is used as a classification scoring element only during the first *201 twelve months of an inmate's incarceration;" (2) OAR 291-104-0111(21), which defines "Violence Predictor Score" as a "score based on a mathematical equation used to determine an inmate's potential risk for violence in an institutional setting during the first twelve months of incarceration *** [including] calculations based on an inmate's age, gender, prior incarcerations, type of crime, aggression, drug history, and certain personality disorders;" and (3) OAR 291-104-0125(1), which provides that an "inmate's classification level will be reviewed when new information is received that affects a classification scoring policy element or when an inmate's Violence Predictor Score has expired."
Those rules indicate that DOC will calculate both a VPS and a Custody Classification Guide score for every incoming inmate and assign each inmate an initial custody level based on the higher of the two scores. An inmate's initial custody level is used to determine, among other things, his or her "housing assignment" and the level of "independent responsibility" that DOC will allow the inmate to exercise while incarcerated. OAR 291-104-0106.
The Custody Classification Guide is a worksheet that DOC has made publicly available; it includes four scoring elements-escape history, prior institutional behavior, detainers, and remaining sentence length-along with criteria for scoring each inmate based on those elements. See OAR 291-104-0111 (the Custody Classification Guide is available from DOC); OAR 291-104-0116 (same).
By contrast, while OAR 291-104-0111(21) enumerates factors that are accounted for in an inmate's VPS, DOC has not set forth publicly how the VPS equation accounts for those factors, including the weight given to each, or how DOC quantifies concepts like "aggression" and "drug history" in order to enter those factors into the equation.[5]
*202 As explained, petitioner argues that the VPS equation is a "published standard" that DOC has not made publicly available in the manner required by ORS 183.355(2). DOC responds that neither DOC nor any other agency has "published" the VPS equation. The legislature has not defined what it means for a standard to be "published." Nevertheless, the legislature's choice to subject only "published" standards to the requirements of ORS 183.355(2) is telling. See Oregon Trucking Assns. v. Dept. of Transportation , 364 Or. 210, 220, 432 P.3d 1080 (2019) ("A statute's text is the best indicator of legislative intent, see State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) [.]").
Although the legislature left the term "published" undefined, there is no indication that the legislature intended that word to mean something different from its plain, natural, and ordinary meaning in this context, and "we look to dictionaries in use at the time" ORS 183.355(2) was enacted to determine the "ordinary" meaning of its words. Smith v. Board of Parole , 272 Or. App. 493, 499, 356 P.3d 158 (2015). The legislature enacted the requirement that agencies must make available "published standards" incorporated by reference into the agencies' rules in 1979. See Or. Laws 1979, ch. 593, § 13. Contemporaneous definitions of "publish" include "to declare publicly," to "make generally known," "to place before the public (as through a mass medium)," and "to produce for publication or to allow to be issued for distribution or sale." Webster's Third New *337 Int'l Dictionary 1837 (1976). Other definitions include "to make public," to "circulate," and "to make known to people in general." Black's Law Dictionary 1109 (5th ed. 1979).
Notably, common definitions of "publish" do not encompass limited disclosures of material to only select groups, including the internal circulation of material within a private or public organization. Rather, "published" material is widely understood to mean material that has already been made available to the public or made known to the general population. Additionally, the legislature's choice to require agencies to disclose "the conditions of the[ standard's] availability to the public " when a "published standard" is "unusually voluminous and costly to reproduce" also indicates that the legislature intended those common definitions of *203 publish to apply. ORS 183.355(2)(b) (emphasis added). Cf. Smith v. Dept. of Corrections , 243 Or. App. 45, 47-51, 51 n. 5, 259 P.3d 42, adh'd to as modified on recons , 245 Or. App. 640, 262 P.3d 404 (2011) (rules adopted by DOC that referenced the "STATIC-99" actuarial risk assessment instrument that DOC used to determine whether an inmate is a "predatory sex offender" were invalid, because the "STATIC-99" had been made publicly available on DOC's website, and the DOC rules adopted that "published work by reference" without "refer[ing] to any exhibits or other material that might inform a person what 'STATIC-99' is" or where it "can be found" (citing State v. Rosado , 25 Misc.3d 380, 889 N.Y.S. 2d 369, 373-94 (N.Y. Sup. Ct. 2009) (discussing the history of the "Static-99" and noting its public availability at http://www.static99.org)). See also OAR 166-500-0040(2) ("Agencies adopting or amending rules incorporating published standards by reference may omit copies of the publications if applicable, under ORS 183.355 [.]").
The legislature could have, but did not, require agencies to comply with ORS 183.355(2) with respect to any standard that the agency refers to in a rule or uses internally to make decisions. Instead, the legislature's decision to require agencies to file or otherwise provide public access only to "published" standards indicates a narrower focus. Indeed, the term "published standard" cannot be read to refer to any standard employed by an agency, because such a broad reading would render the word "published" superfluous. See Hodges v. Oak Tree Realtors, Inc. , 363 Or. 601, 610, 426 P.3d 82 (2018) (we generally "avoid statutory interpretations that would render part of a statute redundant"). Thus, there may be certain standards that have not been not "published," but that are relied on by an agency internally to make decisions, that are not subject to ORS 183.355(2). Cf. Smith v. Dept. of Corrections , 283 Or. App. 425, 426-30, 388 P.3d 1118, rev. den. , 362 Or. 175, 406 P.3d 609 (2017) (DOC's rule that prohibited inmates from "participat[ing] in three-way calls or call forwarding" and the telephone service provider's associated rule that declared a fine of $ 25 for " '[a]ny attempt to make a 3-way call,' " did not violate ORS 183.355(2) 's filing requirement because the rules were "rules of conduct that are not subject to our review" under ORS 183.310(9) ).
*204 In light of the foregoing analysis, we conclude that the equation used by DOC to calculate an inmate's VPS has not been "published." Although the factors that contribute to a VPS are listed in DOC's rules, nothing in this record suggests that DOC or any other entity has made the equation itself publicly available, and petitioner relies solely on the language of ORS 183.355 as the basis for his argument that the VPS equation must be disclosed because it is identified in some of DOC's rules. But the mere fact that the equation is identified in the rules and is used by DOC employees internally to calculate an inmate's VPS, but is not accessible to the general public, does not mean that DOC, or any other entity, has "published" the equation. Therefore, we reject petitioner's argument that the VPS is a "published standard" that is subject to ORS 183.355(2) 's filing requirement.
We note that, because there is nothing in this record that indicates that the VPS has been published, for the VPS equation to be subject to the filing requirement in ORS 183.355(2), some source of law would need to place a legal obligation on DOC to publicly disclose the VPS equation because, if DOC is legally obligated to disclose the VPS equation *338 to the public before assigning an inmate's "initial custody level," then the filing requirement in ORS 183.355(2) would apply. See Smith , 243 Or. App. at 50, 259 P.3d 42 (concluding that, "[n]ot only inmates, but members of the public as well, have an important interest in knowing what criteria * * * [DOC] uses in determining whether an individual is a predatory sex offender"). For example, we have observed that "[a] legislative delegation of power in broad statutory language * * * places upon the administrative agency a responsibility to establish standards by which that law is to be applied." Sun Ray Dairy v. OLCC , 16 Or. App. 63, 70, 517 P.2d 289 (1973) (citing ORS 183.355 ); see id . at 70-73, 517 P.2d 289 (discussing the requirement under ORS 183.355 that administrative agencies generally must establish "written, published standards" to "enable the decision-making body * * * to make its decisions by rule of law rather than for subjective or ad hominem reasons," to ensure that "the policies and practices of the agency are consistent with the legislative policies upon which the delegation of legislative power to the agency is based," and *205 to ensure that courts will be able to perform meaningful judicial review)). See, e.g. , OAR 291-104-0135 (providing for administrative review of the accuracy of an inmate's custody classification score).
With respect to this rule challenge, whether another source of law legally obligates DOC to publish the VPS equation by rulemaking before assigning inmates an "initial custody level" is a distinct issue that was not developed by petitioner-whose argument is premised on the assumption that the VPS equation is a "published standard" subject to the filing requirement in ORS 183.355(2). Petitioner may be correct that the listing of the factors used to calculate an inmate's VPS without disclosing the actual VPS equation is a potential rulemaking problem. However, because petitioner has not meaningfully addressed whether and under what circumstances DOC is legally obligated to publish a particular standard used to reach individual decisions about custody classifications, rather than maintain it internally, we leave that issue for another day. See OTECC v. Co-Gen Co. , 168 Or. App. 466, 488, 7 P.3d 594 (2000), rev. den. , 332 Or. 137, 27 P.3d 1043 (2001) (we "decline to go in search of a substantive argument" when a party "sets forth no meaningful analysis").
IV. CONCLUSION
To summarize our analysis, DOC Policy 90.2.1 and DOC Policy 90.2.2 explain the necessary requirements of DOC's rules related to religious practices and activities in the specific context of searching an inmate's dreadlocks or Native American medicine bag. Thus, those policies are not rules subject to the formalities of rulemaking and we lack jurisdiction to review the validity of either policy under ORS 183.400. Furthermore, the VPS equation is not a "published" standard, as petitioner contends. ORS 183.355(2). Therefore, we reject petitioner's argument that DOC failed to comply with rulemaking procedures when it referenced the VPS in OAR 291-104-0116, OAR 291-104-0111(21), and OAR 291-104-0125(1) without filing the VPS equation with the Secretary of State's office or identifying the location of the equation and the conditions of its availability to the public.
*206 OAR 291-104-0116, OAR 291-104-0111(21), and OAR 291-104-0125(1) held valid; petition for judicial review of Department of Corrections Policy 90.2.1 and Policy 90.2.2 dismissed.

The full text of DOC Policy 90.2.1 and DOC Policy 90.2.2 are available at https://www.oregon.gov/doc/rules-and-policies/Pages/policies.aspx (accessed June 12, 2019).

DOC Policy 90.2.1 and DOC Policy 90.2.2 both cross-reference "the DOC rules on Religious and Spiritual Activities (OAR 291-143) and Searches (Institutions) (OAR 291-041)." (Boldface in original.)

ORS 423.075 is one of the statutes that OAR 291-143-0010 and OAR 291-117-0008 implement. Furthermore, all of the following rules in this discussion of DOC Policy 90.2.1 implement ORS 423.075.

ORS 183.355(2)(a) provides: "Each agency shall file with the office of the Secretary of State each rule adopted by the agency." Additionally, ORS 183.355 (2)(b) provides that, "[u]nless otherwise provided by rule adopted by the Secretary of State, an agency adopting a rule incorporating published standards by reference is not required to file a copy of those standards with the Secretary of State if" the "standards adopted are unusually voluminous and costly to reproduce," and "[t]he rule filed with the Secretary of State identifies the location of the standards so incorporated and the conditions of their availability to the public." ORS 183.355(1) was renumbered as ORS 183.355(2) in 2017. Although petitioner filed his amended petition for judicial review in 2016, we cite the current version of ORS 183.355 because the 2017 amendments do not affect our analysis of this issue.

An inmate's VPS is defined as:
"A score based on a mathematical equation used to determine an inmate's potential risk for violence in an institutional setting during the first twelve months of incarceration. The equation includes calculations based on an inmate's age, gender, prior incarcerations, type of crime, aggression, drug history, and certain personality disorders."
OAR 291-104-0111(21).